[L. A. No. 4897. In Bank.—May 27, 1921.]

EDMUND WELCH, Plaintiff and Respondent, v. EDWARD H. ALCOTT, Defendant and Appellant; IMPERIAL VALLEY FARM LANDS ASSOCIATION (a Corporation), et al., Defendants and Respondents.

[1] PARTNERSHIP—ACTION FOR DISSOLUTION AND ACCOUNTING—EVIDENCE OF PARTNERSHIP—SUFFICIENCY OF.—In this action for the dissolution and accounting of an alleged partnership between plaintiff and defendant it is held that the evidence is sufficient to support the findings of partnership.

[2] ID.—EVIDENCE—BURDEN OF PROOF.—In the absence of a written agreement of partnership, he who alleges its existence must assume the burden of establishing it with clear proof.

2. Intent as essential to creation of partnership, note, Ann. Cas. 1916E, 440, 444, 449.

What agreements establish existence of partnership, note, 43 Am. St. Rep. 229.

Admissibility of evidence of general reputation to prove existence of partnership, notes, 38 Am. Dec. 481; 4 Ann. Cas. 817.

[3] ID.—REAL ESTATE PARTNERSHIP—TRANSACTIONS WITHIN SCOPE OF—PRESUMPTION.—A partnership to engage in the real estate business having been found, the presumption is that all transactions within its scope would be for the benefit of such partnership.

[4] PLEADING—ADMISSIONS—FINDINGS.—Every material allegation of a complaint which is not controverted by the answer is admitted, and as there is no issue on it, no finding is necessary, and if the court finds adversely to the admission, such finding should be disregarded in determining whether the proper conclusion of law was drawn.

[5] PARTNERSHIP—AGREEMENT TO DIVIDE PROFITS.—While it may be conceded that an agreement to divide the gross earnings of a business would not of itself constitute a partnership, an agreement to divide the profits implies an agreement for a corresponding division of losses, unless it is otherwise expressly stipulated and is *prima facie* evidence of the existence of a partnership.

[6] ID.—ACCOUNTING—FINDINGS.—In a suit for a dissolution and an accounting of an alleged partnership it is within the discretion of the court to make findings on the issue of partnership either before or after the accounting is made.

[7] ID.—MODIFICATION OF JUDGMENT.—In such a case modification of the judgment after the entry thereof and while a motion for a new trial is pending made on the offer of the respondent to waive a certain amount erroneously credited to him twice cannot be complained of by the appellant, as it is in his favor.

APPEAL from a judgment of the Superior Court of Los Angeles County. Grant Jackson, Judge. Reversed.

The facts are stated in the opinion of the court.

James P. Clark and F. W. Gail for Defendant and Appellant.

Frank C. Prescott and Prescott & Prescott, for Plaintiff and Respondent.

LAWLOR, J.—This is an action brought by plaintiff, Edmund Welch, against the defendant, Edward H. Alcott, for the dissolution and accounting of an alleged partnership between them. The connection of the corporation defendants—Imperial Valley Farm Lands Association, California Land and Water Company, Title Insurance and Trust Company, and the First National Bank of Los Angeles, which

we shall refer to as the "agent," "sales agent," "trustee," and the "bank," respectively—will hereafter appear.

It is alleged in the complaint that on or about October 1, 1912, the parties entered into a parol agreement of partnership to engage in a general real estate business in the city of Los Angeles and in the Imperial Valley; that the expenses "of the Los Angeles office of partnership" for stenographer, telephone, rent, advertising, and fixtures, and the expenses of the partnership at Brawley for telephone, automobile hire, advertising, improving or purchasing lands, were to be borne, and the losses and profits shared, equally between them; the defendant to attend to the Los Angeles office, keep proper books of account, and render monthly statements of expenses and profits of the partnership; plaintiff to attend to the duties thereof in the Imperial Valley in finding lands to list for sale or improvement, and to show intending purchasers lands held for sale by the partnership; and that the partnership has been conducted from the formation thereof until March 1, 1914, except for the failure of the defendant to perform his duties thereunder, and that in certain specific instances he was "guilty of serious misconduct."

It is further alleged that certain real estate deals were had by the partnership, in some of which the commissions were divided equally and in others were retained by the partner collecting them; that in the Libby Yokum to Chauncey W., Lillian E., and Mabel F. Owen deal, and in the Hans A. Johnson and Mrs. Gena O. Ringer to Chauncey W., Lillian E., and Mabel F. Owen deal, in which the commission was three thousand two hundred dollars, defendant received two promissory notes made to his individual order for one thousand six hundred dollars and one thousand seven hundred dollars, respectively (one hundred dollars of the latter note representing a personal loan to Libby Yokum by defendant), which notes were delivered to and are held by the bank, and that the defendant and the bank refused to recognize plaintiff's interest therein, and that "defendant has been guilty of serious misconduct."

It is further alleged that after the partnership established a town site on the southeast one-quarter of section 4, township 11 south, range 14 east, San Bernardino meridian, at Imperial Junction (subsequently named "Niland"), defendant was guilty of serious misconduct in that he began

advertising the property as his own and held out to the public falsely that he was its sole proprietor; that after a consultation with plaintiff, it was agreed a contract of agency or sale should be entered into between the partnership and the agent whereby the partners should get fifty per cent of the proceeds of the sales, but that defendant on his personal account entered into a contract with the agent by the terms of which it was given for seven years the exclusive right to handle, sell, and dispose of the town site upon the conditions that the agent receive twenty-five per cent of the first proceeds of all sales for commissions, advertising, and the general expenses of handling and selling the property; that an additional ten per cent be then allowed to be expended on improvements; that of the balance the agent receive sixty per cent and defendant forty per cent; that the agent thereupon appointed the sales agent its exclusive selling agent for the same period, agreeing to divide equally the net proceeds to which the agent became entitled under its agreement with defendant; that the defendant deeded the town site property to the trustee and it made a declaration of trust setting forth the respective rights in the town site, and acknowledging the receipt from defendant of the deed of conveyance of the town site property; that the trustee would hold it in trust for defendant, the agent and the sales agent for the purposes indicated in the contracts between the respective parties; that it would sell lots, convey all titles, receive and disburse all moneys in connection with the town site property, and pay the parties their proper portions after the expenses of making the sales and its commissions had been deducted.

Plaintiff prayed for a dissolution of the partnership; that an accounting of the affairs thereof be had; that a receiver be appointed *pendente lite;* for an order that the agent, the sales agent, the trustee, and the bank be enjoined and restrained from in any way disposing of or paying out and yielding up possession of any of the moneys or property of the partnership until the further order of the court, and for a decree enjoining defendants or their agents or representatives from interfering with the plaintiff in participating in the management of the partnership business and affairs.

The defendant and the four corporation defendants interposed separate demurrers to the complaint, which were overruled.

The defendant's answer is a specific denial of the allegations of the complaint, and while admitting that the deals set forth in the complaint were made, and that commissions were divided in certain of them, denies that he and plaintiff ever entered into an agreement of partnership, or that any of the transactions between them were based upon a partnership.

The defendant also alleges that the deal in which he was given the two promissory notes of one thousand six hundred dollars and one thousand seven hundred dollars, respectively, was one in which plaintiff had no interest whatever; admits the execution of the town site contracts heretofore described, and alleges that he was not to receive less than thirty-six thousand dollars; that he should retain all moneys which he had collected upon sales of thirty-four town site lots which he had disposed of up to January 1, 1914, and that those contracts should be assigned to the agent. The answer denies that plaintiff ever at any time had any interest in the town site.

The answer also contains certain affirmative allegations, which are negatived by the findings.

The case was tried by the court, a jury having been waived by the parties. The trial commenced on December 3, 1914, and on February 26, 1915, when the evidence was closed, the court orally announced that the evidence introduced established a partnership between plaintiff and defendant. The court thereupon proceeded to take an accounting. The testimony, oral and documentary, having been introduced, the accounting was continued until March 25, 1915, when the court stated the account, which was filed on July 29, 1915, the action having been dismissed as to the parties sued under fictitious names. On October 13, 1915, the court made its findings of fact and conclusions of law. Judgment was entered on October 28, 1915, decreeing that the partnership be dissolved; that plaintiff and defendant are the owners of the town site, "subject to the trust agreement and declaration of trust," and of the sum of $5,158.19, cash proceeds of said trust now in the possession of the trustee; and of certain personal property and the two promissory notes for one thousand six hundred dollars and one thousand seven hundred

dollars, respectively, which are in the possession of the bank and are to be collected by demand, if possible, and if not, then by suit. It is further decreed that the personal property of the partnership be sold; that the proceeds of the two promissory notes and the above sum of $5,158.19, belonging to the partnership, be divided as follows: That after the above adjustment, the notes, interest, property rights, and equity heretofore standing in the name of the defendant as owner, beneficiary, or otherwise shall belong to and be the property of plaintiff and defendant in equal parts, and that the trustee render and account to plaintiff for an equal one-half of all rights heretofore vested in the defendant; that the bank hold the two notes less payments received for account of the partnership, and pay $230 to the account of plaintiff alone; and that the trustee thereafter fulfill the duties of the trust, rendering to the creditors of plaintiff and of the partnership, respectively, their respective demands and thereafter to plaintiff one-half of the share provided therein for defendant.

On November 8, 1915, the defendant interposed a motion for a new trial, which was denied on January 17, 1916. The appeal is from the judgment and is taken by the defendant Alcott alone.

1. Appellant's principal contention is that the evidence is insufficient to support the findings of a partnership between the parties. The findings in the main follow the allegations of the complaint. Appellant's position is thus stated: "None of the *indicia* of a partnership are to be found in the surroundings of the parties, either at the time of the alleged formation of the partnership, or afterward. . . . The evidence clearly shows that each of these parties did business in his own name and not jointly, and that business was several and not joint."

In support of his claim that he and appellant entered into an oral agreement of partnership on or about October 1, 1912, and conducted it as such until March 1, 1914, respondent offered a great variety of evidence including correspondence, telegrams, advertisements, printed sales forms for the alleged partnership, documents, exhibits, and conversations with, the conduct of, and admissions by, the appellant.

It appears in the evidence that for some years prior to meeting appellant, respondent was engaged in the grading

business with a partner named Sexsmith, in the Imperial Valley; that he met appellant in the early part of 1912, having been introduced to him by one Frank C. Prescott, Jr., an attorney, who suggested they ought to be able to do some business together. On June 26, 1912, an agreement in writing was entered into between appellant and respondent, whereby respondent appointed appellant his agent to secure "contracts for all kinds of reclamation work" on a fifteen per cent commission basis, the parties to employ Prescott to assist in the preparation of all papers necessary in securing such contracts and filing of yearly proofs therein. For his compensation, Prescott was to receive twenty-five per cent of the profits. Just before October 1, 1912, appellant suggested to respondent "that we ought to make some other arrangement besides paying Frank C. Prescott part of the profits"; that the three met on October 1st and appellant advised Prescott that for the amount of work, they did not think they ought to pay him so much. Prescott agreed to withdraw, and retired from the arrangement the following morning. It is not claimed this written agreement has any connection with the issues herein, and we only refer to it as indicating the sequence of events after the parties first met.

Respondent testified that the business in Los Angeles was to be in charge of appellant, and in the Imperial Valley of himself; that he was to attend to the duties of the partnership in the Imperial Valley in finding lots to list for sale or improvement, and to show intending purchasers lands held for sale by the partnership; that appellant secured for the use of respondent room 440 in the Chamber of Commerce Building, Los Angeles, adjoining room 441, where appellant had conducted his real estate business during the preceding three or four years, and it was arranged respondent might dictate his correspondence to the stenographer and pay one-half of her salary and of the general office expenses, including rent and telephone service; that advertisements appeared in the newspapers in Los Angeles and in the Imperial Valley in the joint names of "Alcott and Welch"; that the cost of this advertising was one of the partnership expenses, one-half thereof being charged to respondent; that the appellant had printed and furnished respondent blank forms authorizing "Alcott and Welch" to make sales for the owners of real estate; that respondent in January, 1913, took out a real estate

CLXXXV Cal.—47

license in the Imperial Valley in the name of "Alcott and Welch," the amount of the license—thirty-six dollars—being charged to his account; that appellant took no exception to respondent's action in taking the license out in their joint names; that when respondent saw cards in the Los Angeles office in which his name did not appear with appellant's, he spoke to the latter about it and appellant said "he would attend to that later"; that a great many letters were written to respondent by appellant and many conversations took place between them concerning the real estate business; that when respondent spoke to appellant about the advertisements which appeared in the Los Angeles papers in appellant's name alone, the latter explained that he advertised the partnership business in that way because he was well known in that part of the country, and it was to the advantage of the partnership.

Miss Kate Gatzman, a stenographer in the Los Angeles office, testified she was employed from November, 1912, to May, 1913; that appellant directed her to keep a book of account of the expenses of the Los Angeles office and to charge respondent with one-half of the expenses entered therein; that abstracts of the account-book were made in triplicate—one to be furnished respondent, another to appellant, and the third to be retained as an office copy; that in the latter part of 1912 and during 1913, certain sums of money passed between the parties aside from the commissions derived from the proceeds of sales of real estate negotiated by them. Herman Layer testified that appellant told him "Welch and I are partners." H. E. Williams, one of the respondent's creditors, said appellant assured him "we needn't worry, that as soon as the town site was closed out he [respondent] would have plenty of money to settle his debts; that the town site was in the appellant's name, but that respondent had an interest in it." Richard H. Hobgood testified that early in 1913 appellant told him respondent claimed a partnership and that he spoke of "Ed and I"; "me and Ed" and "us." Miss Louise Barker, another stenographer, testified she started to work for respondent and appellant in October, 1912; that when she asked appellant for a raise of salary he told her he would have to submit the matter to respondent, and that after respondent had been consulted she was given the advance; that ap-

pellant said, "There is a gentleman in business with me who is out of town practically all the time. He said that Mr. Welch took care of the business in the Imperial Valley and he took care of this end of the business."

Miss Cressie Mitchell, a stenographer for Frank C. Prescott, Jr., whose telephone was on the same extension as appellant's, testified that when she told the latter there were calls for respondent, he replied, "Welch and I are partners and when he is called, you can buzz me. . . . Mr. Welch is in the valley but I am his partner. Mr. Welch is in the valley and we are opening a town site." John Garvey and John Welch (respondent's brother), both foremen for respondent on the high-line ditch, testified that on one occasion when respondent's teams were idle appellant came along and said he did not want the teams loafing because he was standing half the expense. Clarence R. Conover testified that when appellant became dissatisfied with respondent, he told the witness "he would have to cease his partnership business with him." Alexander M. Williams testified that in the latter part of 1912, appellant said in plaintiff's presence "they had just formed a partnership, . . . and Welch said the same. . . . Alcott then said that Welch was the best partner he ever had." He says, "You know we are partners. . . . As to an automobile Alcott told me they were going to buy one for the business." This refers to a Cadillac machine which respondent bought, as he claims and appellant denies, for the partnership. Mrs. Bonnybelle Welch, wife of respondent, testified at considerable length about conversations she had with appellant in which he stated he and respondent had gone in the real estate business together as partners. Calvin A. and Gertrude Terwilliger testified to conversations with appellant in which the latter spoke of respondent as his partner.

The testimony for appellant as to the character of the relationship is to the effect that he never entered into a parol or any other sort of agreement of partnership with respondent; that for a long time prior to October 1, 1912, he had been engaged in the real estate business with an office in room 441, Chamber of Commerce Building, Los Angeles; that "about October, 1912, I talked with Welch about changing his office to my place . . ."; that respondent said there were many people coming to him in connection with grading

contracts "and there was a chance to do real estate but that he had no time. He said it will be a good idea to make some arrangement with me to show the lands when I could not come down, and that the other man where he had his office was to move and he wanted another office and I told him room 440 was adjoining my office and I could secure the room. . . . My arrangement with Welch was nothing more than a division of commissions if I had a listing and he had a customer"; that they agreed on such an arrangement; that appellant told respondent he would pay all his own traveling expenses "when I went to Imperial Valley and . . . I should expect him to do the same thing, which I have always done and so has he, as far as I know. We talked until 6 o'clock, coming to an agreement as to how or when the expenses should be paid. This was the winding up of the agreement. . . . He said he was a grading contractor and needed a stenographer in the office to meet customers, and I told him that it would cost twenty dollars a month for the rent of the office, 440 and 441; that if he would pay half of the office rent he could have the privilege of using the stenographer and telephone if he would pay half of the expenses . . . he was willing to do that"; that appellant rented room 440 and sublet it to respondent; that respondent moved into this room and maintained his office there as a grading contractor and devoted his time and attention to that business; that the grading business of respondent was independent of and separate from the real estate business of the appellant, and that the respondent had no interest in the business of the appellant, except that where respondent found a customer for the property listed with appellant, or appellant found a customer where respondent had a listing of land for sale, they would make a division of the commission earned, or, where other agents were interested in the deal, the commission would be split up according to the circumstances in each particular case; that this arrangement continued between the parties, and respondent continued to occupy room 440 until October 1, 1913, when appellant terminated respondent's occupancy of room 440, rented the room to another, and withdrew from the arrangement for a division of commissions.

Appellant also testified that in some of the deals they had together an equal division of gross commissions was made,

while in others they were retained by the one collecting them. The appellant denied that he promised to devote all of his time to the business or that he would keep books of account. "Nothing was said by us . . . about entering into a partnership"; that he had no knowledge as to how or why half of the outside expenses was charged to respondent; that the intention was to charge only half the office expenses; that somebody struck balances in the account book without his permission; that his reason for telling respondent in a letter, which the latter testified to,—"be sure and have the old machine steamed up," was because he would prefer to patronize respondent's automobile. He explained his letter to respondent in which he said "the trip was worth two thousand dollars to us" by stating the word "us" to be a mistake; it should have been "me"; that he was a party to many other trades in which plaintiff got no commission; denied respondent was consulted with reference to negotiations with the agent, contradicted the testimony already referred to of Herman Layer, H. E. and Alexander M. Williams, Miss Cressie Mitchell, John Welch, and Mrs. Welch, and testified he did not know monthly statements were rendered respondent, nor that letters which referred to respondent as his partner were written. Appellant produced a card printed May, 1913, reading, "Edward H. Alcott, Sole Owner." He flatly contradicted respondent's testimony as to a partnership relation ever having existed between them; denied that he introduced respondent to any one as his partner; denied having knowledge of the advertisements signed "Alcott and Welch," and continued: "I did not insert that in the paper. . . . I could barely see to get around at that time. . . . My eyesight had been bad for three years." He admitted, however, discussing with respondent at one time the advisability of advertising in both names, respondent being well known in the valley; and he contradicted respondent's witnesses that he admitted to them he was respondent's partner.

Miss Kate Gatzman testified the items in the account-book were mere memorandums, and that the balance for September, 1913, was not carried over in the October accounts because appellant said he was going to quit respondent.

The court found that on or about the first day of October, 1912, respondent and appellant entered into a parol contract of copartnership to carry on a real estate business together, dividing the expenses and losses between them equally; that the expenses of the Los Angeles office and of the Brawley office and the profits were to be shared equally; that said partnership has been conducted until March 1, 1914, except for the failure of appellant to perform his duties under the agreement of partnership, and that he is guilty of serious misconduct.

[1] We are of the opinion that the foregoing summary abundantly shows the evidence is sufficient to support the findings of partnership. This summary does not assume to refer to all of the evidence, for the record of the trial covers some one thousand three hundred pages of the printed transcript on appeal. We have, however, fully examined the evidence and think we have developed it sufficiently for the purposes of this opinion. While it presents contradictions and inconsistencies on both sides as to the relationship between the parties, it will be presumed the court took all such matters into account in arriving at its decision. The respective versions of the parties as to the character of the relationship present a sharp conflict in the evidence, and we are bound by the determination of the question by the trial court. The evidence of appellant's conduct and his admissions (Code Civ. Proc., sec. 1832), as to the existence of the partnership, which we must assume the court believed and acted upon, would alone support the findings.

Many of the assignments of insufficiency are addressed to the weight of the evidence and to the credibility of the witnesses, which were matters for the trial court to determine. [2] Appellant cites a number of authorities to support the proposition that in the absence of a written agreement of partnership he who alleges its existence must assume the burden of establishing it with clear proof, which indisputably is the law. Certain phases of the evidence are emphasized in the argument: For instance, it is pointed out that in a number of deals each of the parties retained the commission he collected; that there is a variance between the allegations and proof—it is alleged appellant was to devote all of his time to the partnership business and that he subscribed for telephone service after the partnership was

formed, as to which matters respondent's testimony is silent. But it was not necessary to allege or prove that appellant was to give all his time to the business in order to constitute a partnership. Other illustrations are that each party had his own individual cards and stationery printed subsequently to October 1, 1912, giving the same office address; that on respondent's card the appellant's name appeared as his "sole agent," respondent claiming, however, that this referred to his grading and not to his real estate business; that respondent's name was not put on the door of room 441 with appellant's, nor did he have it printed on room 440 after removing the name of the former occupant; that there was no partnership bank account; that the advertisements which respondent put in the "Brawley News" both for the grading and real estate business were in his individual name; that he had an individual rubber stamp made, the cost of which was charged to him personally, respondent testifying, however, that the stamp was used on his old stationery; that respondent presented for the first time at the trial a statement or claim purporting to show the expenses he incurred for the partnership to the extent of about two thousand five hundred dollars for the months of January, February, March, April, and May, 1913 (which is included in the accounting), and as to which appellant makes the point that notwithstanding respondent now claims he is entitled to this credit, he said nothing to appellant about it when the latter was endeavoring to collect from him one-half of the office expenses; that during this time respondent was "hard up" and borrowed money of appellant. But in view of what we have already said it will not be necessary to further consider the arguments of appellant as to the sufficiency of the evidence to sustain the findings of partnership.

2. The court found that the Yokum-Owen and Johnson-Ringer-Owen deals were partnership transactions, and the money held by the bank partnership funds; that the contracts with the agent and the sales agent, and the trust agreement and declaration of trust, were for the benefit of the partnership. Respondent testified these were partnership transactions and appellant denied respondent was in any manner connected with them. The findings must be upheld.

3. The appellant contends that findings III, VI, and XI relative to the town site are without support in the evidence. His position is that the town site was his own personal undertaking; that respondent had no interest in it and that he paid no part of the consideration. In other words, appellant's claim is that respondent's connection with the town site was by virtue of a contract entered into between them whereby respondent agreed to level, grade, and lay out the property; that he did the work and was paid for it.

The testimony of the parties as to the town site is strictly at variance. Respondent testified that the partnership owned the town site; that in July, 1912, either appellant or Prescott gave him for investigation a list of United States government lands in the Imperial Valley that were to be thrown open for homestead entry on August 22d following; that he told appellant the quarter-section would make an "elegant town site"; that appellant said he did not have sufficient money to "scrip" it, but to let W. I. Alcott (appellant's son) file on it, "and later on maybe we would have the money and we would buy it from him"; that W. I. Alcott came to the Imperial Valley on August 20th, and on the night of the 22d respondent let him have an equipment, and he went on the land "a few seconds after midnight"; respondent testified he had witnesses present to note the making of the location. W. I. Alcott filed on the land September 23d. Respondent testified that he agreed to grade and clear the land as an offset for the moneys expended by appellant for the relinquishment and "scripping" of the location. There is a variance in the complaint, the evidence, and the findings as to the cost of the work. The complaint alleged it to be five thousand five hundred dollars; respondent testified that he and appellant figured it would cost four thousand dollars, while the finding is four thousand two hundred dollars. Respondent explained that "the five thousand five hundred dollars stated in the complaint I understood included some work on the high-line canal," and that the item is apportioned between the town site and the high-line ditch in the accounting. However this may be, appellant's answer alleged that respondent agreed to do the town site work for him for four thousand two hundred dollars.

Respondent's testimony is corroborated by several of his witnesses. As already shown, H. E. Williams, Miss Cressie

Mitchell, and Miss Louise Barker testified to admissions by appellant as to the town site. Miss Catherine Gatzman testified that she wrote letters to respondent at the dictation of appellant regarding lands in the Imperial Valley. Alexander M. Williams also testified appellant told him that he and respondent "should make at least one hundred thousand dollars apiece out of it. . . . You know he has an interest in the town site, but if he isn't careful he won't get anything." Mrs. Welch also gave corroborating testimony as to the ownership of the town site by the partnership. Appellant testified that in August, 1912, respondent told him about this quarter-section and an adjoining quarter-section at Imperial Junction; that he employed respondent to put W. I. Alcott on the 320 acres and agreed to pay him $250 for his services— one hundred dollars when W. I. Alcott went into the valley, and the other $150 on the making of the entry; that respondent put W. I. Alcott on the quarter-section involved here on August 22d, where he remained until March, 1913; that appellant paid respondent one hundred dollars; that in February, 1913, he purchased the relinquishment from W. I. Alcott, for which he paid him two thousand four hundred dollars, and secured scrip for the property at a cost of $2,020; that he contracted with respondent to level and grade the town site for four thousand two hundred dollars; that the work was done by respondent and the contract price paid; and that respondent had nothing to do with the sale of any town site lots or with platting the town.

Appellant produced a number of witnesses. Clarence J. Park testified he platted the town site under the appellant's direction. "I had a letter from Alcott to say as to how the work should be done. I located the center line on the streets and Mr. Alcott and Mr. Welch and myself discussed the best manner of doing the work. . . . I had no conversation with Mr. Welch as to whether he was doing the work by contract or otherwise." J. E. Arnold testified respondent told him he did the town site grading by contract for four thousand dollars. "Nothing was said about Welch having any interest in the town site. Welch did say, however, 'if I had anything to do with Imperial Junction I would show them how to do it and stir things up.'" W. M. Boyle testified respondent told him he had graded the town site for appellant for four thousand dollars. Myron

D. Witter testified he was connected with a Brawley newspaper; that respondent did advertising in his own name; that appellant ran an advertisement for "scripping" Imperial Junction in his own name. L. O. Crummer testified that in his conversation with respondent, the latter never made any statement about having any interest in the town site, and W. I. Alcott testified he never had any conversation with his father about relinquishing the town site until March, 1913; and that he never discussed the subject with respondent. B. E. Colvin, F. G. Havens, and Hedge A. Havens testified they would not believe either respondent or Clarence R. Conover under oath.

The court further found that pursuant to the agreement of partnership, respondent and appellant agreed to procure the relinquishment of the quarter-section at Imperial Junction for the purpose of establishing a town site thereon, that appellant procured the relinquishment and paid to the homestead entryman (W. I. Alcott) two thousand four hundred dollars, and for the same purpose procured soldiers additional rights, called scrip, and subsequently a patent for the quarter-section, and informed respondent that he had paid $1,715 ($1,790 is the amount alleged in the complaint) therefor on account of the partnership; that respondent should promptly level and grade the land for the necessary streets and lots of a town site for the partnership account, and as an offset for the cash paid out by appellant, the difference in amounts to be adjusted in the partnership accounts; that respondent did level and grade the town site at a cost of about four thousand two hundred dollars, for the partnership account; "that appellant was guilty of serious misconduct in that he began advertising the said property as his sole estate and advertising himself as the sole owner and held out to the public falsely at times the claim that he was the sole owner of the said town site."

Upon this and other evidence it is plain that the findings touching the town site cannot be disturbed. As on the issue of the character of the relationship between the parties, the evidence of admissions by and the conduct of appellant would alone support a finding that the town site was a partnership affair. The evidence is involved in conflict on every material phase of this issue. It was for the trial court to determine whether the testimony of respondent or

appellant as to this project was true, and as their respective versions are diametrically opposed, it would serve no purpose to state in detail the arguments of appellant. It is not questioned that respondent did the work, and according to the theory of appellant the contract price was four thousand two hundred dollars, which the court found to be the cost. We have quoted from respondent's testimony that the difference between the amount charged (five thousand five hundred dollars) and the amount found (four thousand two hundred dollars) was on account of the high-line ditch. Moreover, the findings are to the effect that respondent was to improve the property as an offset to appellant's cash contribution, and there is no suggestion that the doing of the work was dependent on the cost thereof.

Appellant lays stress on what he describes as inconsistencies and contradictions in respondent's position. Our attention is directed to an affidavit which he made on July 22, 1913, wherein he averred that his "occupation is a teaming contractor and his principal work is that of doing assessment work on government land entries," and that during the four years he had known the quarter-section it has been in its natural desert state except for the work done by appellant and his predecessor in interest, W. I. Alcott. This affidavit was made in connection with the application of Carmen F. Carlson for reinstatement on the land. Attorney George R. Wickham, whom appellant employed in that proceeding, testified respondent stated to him he was to do the work for appellant and never spoke about his, the attorney's, employment or paid him any part of his fee. Reference is made to the following testimony of Mrs. Sadie B. Hendricks, having regard to the Hendricks' deal: "I . . . demanded the money back. . . . I said to him, 'You said you were working for Mr. Alcott. Why don't you get it from him?' and he said that he was overpaid already. He said that he had a contract to grade Imperial Junction and was getting over four thousand dollars for the work. . . ." But while this affidavit may appear inconsistent with respondent's claim that the town site was partnership property, it is conceivable the trial court concluded the parties were in collusion for the purposes of the contest.

It may be said generally of appellant's contentions as to the town site that the evidence, considered together, is

ample to support the findings. It was for the trial court to harmonize any inconsistencies or contradictions and to consider the evidence of impeachment in arriving at its conclusion, and we must assume in favor of the judgment that this was done.

4. This is likewise true of appellant's contention in regard to a certain chattel mortgage for three thousand five hundred dollars, dated March 14, 1913, given him by respondent, which the former asserts and the latter denies was for a consideration. This transaction was not pleaded and no finding was made in regard to it. Appellant testified that in March or April, 1913, respondent executed the mortgage on his grading equipment (which was inventoried at $5,602.50) for three thousand five hundred dollars, the consideration being made up of one thousand five hundred dollars which appellant claimed respondent had borrowed in different sums from him, and two thousand dollars for the R. M. Sipple tract—14–11–13—which respondent was to give to Mrs. Martin, his mother-in-law. Appellant had previously purchased the property from Sipple. This was the second mortgage respondent had executed on his grading equipment, one having been given to the First National Bank of Brawley for nine hundred dollars. Appellant claims he paid for the grading work by the release of the three thousand five hundred dollar mortgage and the payment to respondent of seven hundred dollars in cash. Respondent's version is that he said to appellant: " 'I have got to get some money to keep things going and to get this thing straightened out.' He said, 'I thought we would make some money.' I said to him 'You told me you could raise money.' . . . He said, 'The bank has a first mortgage on your grading outfit, you give me a second mortgage and that will hold things together until we can sell some lots and take care of things. I will hold it until we get the town site fixed up and we can sell some lots. If we don't, we can't get the town site fixed up or get the water there either.' " Respondent also testified that he received no consideration from appellant for the chattel mortgage; that it was given to protect respondent from his creditors while he was extending the high-line ditch to the town site; and that about a year after he completed that work appellant released the chattel mortgage, without any consideration.

Appellant argues that certain admissions and conduct of respondent preclude the idea that the mortgage was without consideration and was merely given to protect the equipment from the claims of respondent's creditors. Frank Birkhauser, attorney for the First National Bank of Brawley, testified that on or about July 31, 1913, in a conversation between himself and the parties the respondent requested an extension of time, but that the bank wanted appellant to release certain of the mortgaged property so that it would have additional security before extending the time on the mortgage. The witness said: "At a conversation in front of the Bungalow Hotel Welch said that Alcott's mortgage was paid by work, I think, on the town site." Appellant also mentions the evidence that the stenographer wrote "Bal. in full payment of chattel mortgage" on the check stub when, as he claims, the final five hundred dollars was paid, and other matters which he asserts tend to prove that there was a consideration for the mortgage. In support of respondent's position that there was no consideration he emphasizes the fact that in plaintiff's exhibit "I" appears the entry of March 4, 1913: "Relinq. R. M. Sipple $400," and on the same page of the book one-half of the total expenses for this month are charged to respondent, notwithstanding appellant's claim that he agreed to purchase this identical property a few days later for two thousand dollars. Moreover, respondent contends appellant has not satisfactorily accounted for the remaining one thousand five hundred dollars. Two items of five hundred dollars and $125, respectively, appear in schedule 10, and appellant makes the indefinite statement as to the payment of the remaining $875—"the balance of the chattel mortgage consisted of several small items. . . . It was all figured up at the time." A finding against appellant's contention must be implied from the omission of a credit in the account for the $875.

Appellant makes the point that it is neither alleged nor found that respondent agreed with appellant to do the grading work, but merely that the appellant "urged and insisted" that it be done by respondent "as an offset for the cash paid out by defendant Alcott." The quoted language is from the complaint. We think this is equivalent to a formal allegation that the parties made an agreement to

that effect. In any event the work was done. **[3]** A partnership to engage in the real estate business having been found, the presumption is that all transactions within its scope would be for the benefit of such partnership.

5. Appellant also makes the point that respondent is entitled to no relief because by his own admissions the chattel mortgage was fraudulent. Respondent, in answer to this contention, relies on the testimony already quoted to show that appellant originally suggested the execution of the chattel mortgage. The presumption is that the court so resolved the evidence, and hence, appellant is estopped to invoke the equitable doctrine.

6. Appellant contends that the evidence does not justify the implied finding that the work of bringing water to the town site through the high-line ditch was a partnership undertaking, and in debiting him with one-half of $2,033.87— the amount of the loss on high-line ditch No. 5. This project was not pleaded, but findings in favor of respondent are to be implied from the accounting wherein the debts and the above loss appear. Respondent's testimony as to the high-line ditch is that in the latter part of 1912 he suggested to appellant it would be advisable to secure water for the town site, and that the Imperial Water Company had offered him a contract to extend the high-line ditch to the property; that he told appellant the contract would entail a loss and that the latter replied: "Well, anyway, we can manage to get the water up to the Junction, and whatever it is when we sell the town site . . . we will balance it up. He told me the loss whatever I would be put to, or we would be put to, on the high-line ditch we would divide between us"; that he entered into a contract with J. W. Yokum, vice-president and director of the Imperial Water Company, to extend high-line ditch No. 3 and high-line ditch No. 5, on a per diem basis for his teams, and that he made the extension and the water went through the ditch to the town site. The appellant testified he had no connection whatever with this undertaking, but that respondent did the work under a contract with J. W. Yokum. He stated further that about March 1, 1913, he learned for the first time that respondent was doing the work; that respondent "had gone in the hole on the high-line work"; came to him and wanted money "to pay his help on the

high-line work." Appellant's position is that the extension
of the high-line ditch was a matter between respondent and
J. W. Yokum and that he was in no way connected with it.

J. W. Yokum testified he had an oral agreement with
respondent about work on high-line ditch No. 5; that he and
respondent went to the Brawley Bank and signed up a con-
tract whereby the latter was to get paid as he went along.
Frank Birkhauser testified respondent and Yokum came in
to arrange for some work on the high-line ditch, and that
respondent was to get paid as he did the work. The evi-
dence as to this work is such that the implied finding that it
was done for account of the partnership must be sustained.
Respondent's testimony is flatly contradicted by appellant,
but that only presents a conflict which the court resolved
on the side of the former. In addition to the evidence
already set forth it appears, among other things, that in a
letter to Mrs. Martin under date of August 15, 1913, ap-
pellant said: "I am assured by the Water Company that
they will furnish me water about November 1st, and being
one of the organizers of the Water Company No. 3, I
am positive that the information is correct." The court
may have attached importance to this letter in view of ap-
pellant's testimony that he was not aware the work was be-
ing done. We must conclude that respondent's version was
accepted by the court. Moreover, the project was of great
concern to the successful operation of the town site, and
the trial court probably concluded the work was not done
without the cognizance and co-operation of appellant.

7. Appellant next contends the evidence is insufficient to
support findings III and VI, as to the Hall-Sutton, Bergon-
Antes, Easton-Mitchell, and Flicker deals, and the account-
ing thereof, for the reason that they are contrary to the
admissions of the pleadings and to the evidence. The
method pursued by the court in the accounting was to credit
each of the parties with the money paid out by him for
the benefit of the partnership, and to debit each with the
commissions received by him, the difference between the
relative contributions and expenses forming the basis of
the money judgment in favor of respondent. The account
appears in ten schedules and is presented in recapitulatory
form in the findings as follows:

*Credit.*

Money Paid Out by Alcott for Benefit of the Partnership:

| | | |
|---|---|---|
| Expenses of real estate business..(Schedule 1) | | $2,832.41 |
| On account of town site of "Niland" ....................(Schedule 2) | | 5,656.86 |
| Traveling expenses account of town site ..................(Schedule 3) | | 624.15 |
| Total credit ......... | | $9,113.42 |

*Debit.*

| | | |
|---|---|---|
| Commissions from real estate business .......................(Schedule 4) | $4,151.54 | |
| Sale of town lots at "Niland"......(Schedule 5) | 2,045.00 | |
| Total debit .......... | $6,196.54 | 6,196.54 |
| *Partnership owes Alcott*....... | | $2,916.88 |

*Credit.*

Money Paid Out by Welch for Benefit of Partnership:

| | | |
|---|---|---|
| Expenses of real estate business....(Schedule 6) | | $1,781.15 |
| On account of town site...........(Schedule 7) | | 4,200.00 |
| Loss, high-line ditch...............(Schedule 8) | | 2,033.87 |
| Total credit........... | | $8,015.02 |

*Debit.*

Welch Received for Use and Benefit of Partnership:

| | | |
|---|---|---|
| Commissions from real estate business ........................(Schedule 9) | $1,825.00 | |
| Cash from Alcott................(Schedule 10) | 1,271.78 | |
| Total debit .......... | $3,096.78 | 3,096.78 |
| *Partnership owes Welch*....... | | $4,918.24 |
| Welch credit.......... | $4,918.24 | |
| Alcott credit ......... | 2,916.88 | |
| Welch over Alcott.. | $2,001.36 | |

The account then states the debts of the partnership:

| | |
|---|---|
| High-line ditch No. 5.................................... | $4,249.37 |
| Debts in the real estate business........................ | 503.33 |
| | $4,752.70 |

In the Hall-Sutton deal the testimony of both parties agrees with the complaint and answer that a commission of nine hundred dollars was earned, received by appellant, and one-half thereof paid by him to respondent. The finding is that "the commission . . . was nine hundred dollars . . . and . . . was paid to the said defendant Alcott and shown in the accounting taken herein." In the accounting the nine hundred dollars is debited to appellant in schedule 4, but respondent is not debited with any part

thereof in schedule 9. Appellant testified: "That deal was all settled at the time it was made. It was settled by a division of the money; . . . there has never been any contention between us in regard to the Hall-Sutton money. . . . I turned over the money to Welch right there in my office in cash." The following colloquy occurred:

"Mr. Alcott: The amount of the Hall-Sutton commission would be nine hundred dollars. That deal was all settled at the time it was made. It was settled by a division of the money; by a division of the Hall-Sutton money.

"Mr. Clark: That is the allegation of the complaint and the admission of the answer.

"The Court: If that is the admission of the answer there is not much use in going into it.

"Mr. Prescott: Well, it ought to be included in this statement.

"The Court: I cannot make them put it in the statement. It would be included in the judgment.

"Mr. Prescott: That is all right, then.

"The Court: That left $818.03 to be divided.

"Mr. Clark: Your honor, of course, will have regard for the testimony of the plaintiff that it was divided between them.

"The Court: I know it was divided between them. Proceed, gentlemen."

Respondent testified: "As a final result of the deal I believe Alcott drawed down the money, paid the expenses and gave me my share of the commission." Obviously, if the parties each received one-half of the commission each should be debited accordingly, or the transaction omitted from the accounting entirely. Respondent gives no satisfactory explanation in his brief as to why he was not debited with $450, and we do not find that appellant was anywhere given credit in the accounting for the payment of that sum to respondent.

It may be explained that plaintiff's exhibit 1 is the book of account referred to in the testimony of Miss Kate Gatzman as having been kept by appellant in which the expenses of the partnership paid by the Los Angeles office were entered. It was the practice of appellant at the close of each month during the first year to total the expenses, debit respondent with half thereof, together with any cash ad-

vanced to him, then credit him with half of the commissions of the particular month, and the difference, if any, between half of the commissions and half of the expenses, carried over to his credit or debit, as the case might be, in the succeeding month. Defendant's exhibit 62A is a statement prepared by him of all commissions which he received. The Hall-Sutton deal does not appear in such monthly adjustments in plaintiff's exhibit 1, nor in defendant's exhibit 62A. The accounting is, therefore, erroneous in that while appellant is charged with the entire commission, respondent was not debited with one-half thereof which the complaint alleges and he testified he received. Respondent will be debited with $450 and the debit against appellant reduced correspondingly.

But apart from the accounting, no issue was presented by the pleadings as to the disposition of the commission. [4] "Every material allegation of the complaint, not controverted by the answer, must, for the purposes of the action, be taken as true . . . " (Code Civ. Proc., sec. 462.) It was said in *Burnett* v. *Stearns,* 33 Cal. 468: "The finding should be confined to the facts in issue. The province of the court in respect to facts is to determine but not to raise the issue." (See, also, *Ortega* v. *Cordero,* 88 Cal. 221, [26 Pac. 80].) "Where a complaint in an action contains an allegation of fact which is distinctly and unqualifiedly admitted by the answer, there is no issue as to the fact. The allegation of fact being admitted it is conclusive. A finding against the admission is therefore outside the issues." (*White* v. *Douglass,* 71 Cal. 115, 119, [11 Pac. 860].) It was declared in *In the Matter of Doyle,* 73 Cal. 564, 570, [15 Pac. 125, 128]: "When a trial is had by the Court without a jury, a fact admitted by the pleadings should be treated as 'found.' . . . If the court does find adversely to the admission, such finding should be disregarded in determining the question whether the proper conclusion of law was drawn from the facts found and admitted by the pleadings. . . . In such case the facts alleged must be assumed to exist. Any finding adverse to the admitted facts drops from the record, and any legal conclusion which is not upheld by the admitted facts is erroneous." (See, also, *Hutchison* v. *Barr,* 183 Cal. 182, [190 Pac. 799]; Sutherland on Code Pleading, sec. 1167.) "There can be no necessity of a

finding as to a fact admitted by the pleadings. The finding is required only when an allegation of a material fact in the complaint is controverted by the answer, so as to raise an issue." (*Swift* v. *Muygridge,* 8 Cal. 445.)

The Easton-Mitchell deal comes under the same general rule. It is alleged in the pleadings and testified to by appellant and respondent that the commission of four hundred dollars was earned and divided equally between them. The court found that appellant received the entire amount, which is accordingly debited to him in schedule 4, with no corresponding debit to respondent in schedule 9. In the absence of any issue of fact as to the division of the commissions, there was no need of findings except on the issue of partnership. Respondent must, therefore, be debited with two hundred dollars, and the four hundred dollars debited to appellant in the accounting reduced correspondingly.

In the Bergon-Antes deal the complaint alleged that "a commission of $233.20 was made and the same divided equally" between the parties. This seems to be the full amount of the commission in this deal. The answer, however, admits the sale and alleges "that the commission was split in three parts and divided" equally between the parties and Frank C. Prescott, Jr. The court found appellant received the commission and the amount, therefore, is debited to him in schedule 4, and no part of it is debited to respondent in schedule 9. Respondent's direct testimony is: "I was not present when it was settled. I never understood that Frank C. Prescott, Jr., had anything to do with it. I had no talk with Alcott about the commission." On cross-examination respondent stated: "I don't know that Prescott got one-third of the commission. Alcott told me that he did and I asked Prescott and he said he didn't." It is argued in respondent's brief that the finding is in no way inconsistent, but in referring to the accounting this statement is made: "The monthly balances were ignored and a general balance struck; $116.60 went to Welch, $116.60 to Alcott, and $116.60 to Prescott, Jr." Appellant's testimony is in line with his answer, but plaintiff's exhibit 1 shows that in making up the balance for December, 1912, respondent was credited with $116.60 against his share of the expenses for that month, while defendant's exhibit 62A credits him with $77.73, the same sum being debited to

Prescott. The only issue calling for a finding as to this commission was whether it was divided into two or three parts. As the testimony in the two said exhibits presents a conflict, it must, in the face of the findings, be presumed the court concluded the parties alone were entitled to the commission, but as the pleadings allege and admit the commission was divided, it follows it should not be debited to appellant alone. Respondent will, therefore, be debited one-half thereof—with $116.60—and appellant's debit reduced correspondingly.

In the Flicker deal the complaint alleged that the partnership earned a commission of $532 and that it was divided equally between the parties. The answer admits the commission was earned but alleges it was split into three equal parts, the parties and one G. J. Reinert each receiving one-third. The court found appellant received and retained $533.34. The only variation in the testimony of the parties (Reinert did not testify) is that while appellant testified Reinert received one-third, respondent stated he received "a part of it," and in view of the vague and indefinite character of respondent's testimony on the point, it must be assumed the court found that by the quoted phrase was meant his share of the commission. Appellant is debited in schedule 4, but respondent is not debited with any portion of the commission in schedule 9. It is evident from the record that the total commission was eight hundred dollars and that the pleadings must be construed as alleging and admitting that one-third thereof was actually paid to Reinert. In other words, the only dispute between the parties concerning the commission was as to the two-thirds of the eight hundred dollars—$533.34 (stated, however, as $532 in the complaint and answer). There can be no question but that Reinert actually received one-third of the eight hundred dollars. This is borne out by defendant's exhibit 62A, for therein the amount of the commission is indicated as eight hundred dollars, $266.66 of which was *paid* to Reinert and $266.67 *credited* each to respondent and appellant. Giving this interpretation to the pleadings, no issue is presented as to the division of the commission—the complaint and answer alleging it was divided—and there was no occasion for findings. Respondent must, therefore, be debited with

$266.67, and appellant's debit of $533.34 reduced correspondingly.

It is proper to mention, in respect to the question of fact whether respondent actually received his share of the Easton-Mitchell, Bergon-Antes, and Flicker deals, or was merely given book credit therefor by appellant, that defendant's exhibit 62A contains this admission: "Credits due Edmund Welch on commissions on Easton-Mitchell, the Bergon-Antes and Flicker deals amounting to $544.40 [$200.00, $77.73 and $266.67, respectively, or a total of $544.40] *credited on office expenses*" (italics ours). However, in the presence of appellant's contentions we have, where applicable, decided according to the state of the pleadings. But whatever may be the fact as to these deals, respondent actually received his share of the Hall-Sutton commission.

Appellant attacks the finding in the Hendricks deal which is to the effect that a sale was attempted in the business of, but no commission was made for the partnership. The complaint alleged the deal was made in the business of the partnership and a commission of two hundred dollars was earned "and the same accounted for in the partnership." The answer denies the deal was for the partnership and alleges it was "made by the plaintiff alone and for his own account"; that appellant had nothing to do with it, nor did he claim or receive any part of the commission received by respondent. The commission does not appear in the accounting. Respondent testified the deal was made by him and Carroll Owen and that he, respondent, got all the commission and "it was never accounted for in the partnership." Appellant's testimony follows the answer. The finding is that the partnership did not earn the commission. All the evidence, however, shows respondent actually received the commission and retained it. The finding is therefore contrary to the complaint and the evidence. It was developed in the direct examination of respondent that an action brought by Hendricks against him alone for the recovery of the commission on the ground of fraud was then pending. It is not made to appear, however, whether this action is responsible for the finding. A new trial of this issue is necessary.

Appellant also questions the findings in the following deals, the first three of which were made by the respondent:

It was alleged in the Hanson deal that the commission was $475, and this amount was debited to respondent in schedule 9. The Wills deal was not pleaded. The respondent was debited with the entire commission as being $150. Because respondent testified the commission was "$150 or $160" appellant claims the accounting was not correct. But the evidence would sustain a finding of either $150 or $160 and therefore cannot be disturbed. As we have sustained the findings of partnership, it follows that all deals after October 1, 1912, were partnership affairs, and as appellant was credited with his share in the accounting, we shall not further consider the contentions as to these two deals. The Judd-Lewis deal was not pleaded. There was a conflict in the evidence as to whether the commission was "between three hundred dollars and four hundred dollars," as respondent testified, or "four hundred dollars" as L. O. Crummer, appellant's witness, testified. The court found it to be $320 and it was divided equally in the accounting. There was ample evidence to sustain the finding.

The point made by appellant in the Williams, Yokum-Owen, Johnson-Ringer-Owen, and Surfleuth deals, the commissions in which were received and retained by and debited to appellant, is that he made the deals independently of respondent. But this point is foreclosed by the findings of partnership. In the Terwilliger and Edgar-Andrews deals it was alleged they were conducted jointly by and the commissions divided equally between respondent and appellant. The latter's objections to these transactions are answered by the findings of partnership—as is the point made in the Medberry deal.

Appellant also urges that respondent was improperly allowed a credit of $230 in the judgment. The record shows that this sum is for one-half of $460, which the court found was subsequently collected by appellant on account of principal and interest on the Yokum-Owen, Johnson-Ringer-Owen notes. The accounting shows that respondent's contribution to the partnership exceeded that of appellant's by $2,001.36. The judgment directs that respondent be allowed $230, as representing "one-half of defendant Alcott's subsequent collections on said notes of $460"—making a total money judgment of $2,231.36 in favor of respondent.

The first of these notes, dated March 20, 1913, was for one thousand six hundred dollars, to run for two years, with interest at seven per cent, payable semi-annually. A $168 interest debit appears in defendant's exhibit 62A, and has been debited to appellant in schedule 4. When the judgment was entered on October 28, 1915, the fifth payment of interest was due, making a total of $280 (5 x $56), and deducting therefrom the above $168, a balance of $112 remained. Four payments of $56 each were indorsed on the note (each representing six months' interest). Another payment of $56 appeared on the second note, evidently by mistake, as will be readily apparent from the difference in the respective interest payments. Here, then, was one of the "subsequent collections" of $112.

The second note, dated March 21, 1913, was for one thousand seven hundred dollars, to run for ninety days with interest at seven per cent, payable quarterly. A payment of three hundred dollars was made on the principal of this note on July 18, 1913, leaving one thousand four hundred dollars due on the principal sum. Seven per cent on one thousand four hundred dollars makes a quarterly payment of interest of $24.50, so that when the judgment was entered the total interest representing ten payments amounted to $245. In defendant's exhibit 62A, appellant debited himself with six payments of $24.50 each, or $147, which sum is also debited in schedule 4. Six interest indorsements of $24.50 each appear in this note. The difference between $147— six payments—and $245—ten payments—makes another of the "subsequent collections" of $98. Hence, these two "subsequent collections" make a total of $210. Add to this $250, a partial payment on the principal on May 14, 1914, and a total of $460 results, one-half of which is credited to respondent in the judgment. In the computations of interest on this note no account is taken of the above three hundred dollar partial payment on the principal between June 21, 1913—the close of the first interest quarter— and July 18, 1913, the date of said payment, or between May 13, 1914—the date of the payment of $250 on the principal—and September 21, 1915, the end of the quarter immediately preceding the rendition of the judgment. But if the point is raised, these items can be adjusted when the notes are liquidated.

8. Appellant's next contention is that the evidence is not sufficient to sustain the findings settling the account. We quote from the brief: "The defendant's exceptions to the statement of the account by the court, which covers practically all of the items thereof." One hundred and thirty-four objections and exceptions were made and taken to the statement of account by the court, many of them relating to inconsequential items. We have considered these specifications and do not think appellant could have been seriously prejudiced by any of the indicated rulings, even if erroneous, for there is an abundance of competent evidence to sustain the account. It will not be necessary, therefore, to describe these specifications.

9. In connection with appellant's contentions that the evidence is insufficient to support the findings of partnership it is urged that the complaint is insufficient. It is asserted that "the allegations of the complaint as to the partnership in the real estate business are not only insufficient, but the specific allegations therein as to deals made and division of commissions earned are sufficient to show that no partnership in fact existed between the parties." This point was raised on demurrer. We submit that the specific allegations of the complaint as to the real estate deals must control the general allegations of partnership. The demurrer is not contained in the record. It is sufficient to state that this contention overlooks other allegations of the complaint which make it clear that a partnership and not an agreement for a division of gross earnings is pleaded.

10. Appellant has cited a great many authorities in support of his contentions, which contain correct statements of the rules of law to which they are addressed. None of them is opposed to the conclusion we have reached. For instance, it is urged that the parties must have formed a definite intention to become partners. We have already subscribed to the doctrine that the burden of establishing a partnership is on the one alleging its existence. Appellant cites *Wheeler* v. *Farmer*, 38 Cal. 203, 213, to the proposition that "an agreement to divide the gross earnings does not constitute the parties to it partners." But neither that authority nor any of the others relied upon by appellant sustains his contention that the relationship between these parties

did not constitute a partnership. [5] It may be conceded that an agreement to divide the gross earnings would not of itself constitute a partnership, but according to the pleadings, the evidence, and the findings, the parties did more than agree to divide the gross earnings; they agreed to divide the profits of the business. "A right to participate in profits affords cogent, often conclusive, evidence that the trade in which the profits have been made was carried on in part for or on behalf of the person setting up such a claim." (Lord Cranworth, in *Cox* v. *Hickman,* 8 H. L. Cas. 268; Gilmore on Partnership, p. 31.) It has also been declared that "sharing profits is *prima facie* evidence of the existence of a partnership." (Gilmore on Partnership, sec. 11, p. 31; Uniform Partnership Act, Rowley's Modern Law of Partnership, sec. 84.) "Profits" is a relative term and contemplates losses. The Civil Code provides: Section 2395: "Partnership is the association of two or more persons, for the purpose of carrying on business together, *and dividing its profits between them.*" (Italics ours.) Section 2404: "An agreement to divide the profits of a business implies an agreement for a corresponding division of its losses, unless it is otherwise expressly stipulated." The appellant does not contend that the incidental expenses of the deals and the expenses of the Los Angeles office were not to be divided equally between them. Plaintiff's exhibit 1 was kept under appellant's direction and shows that the expenses were entered therein and half of them charged to respondent. The evidence, including correspondence between the parties, the admissions and conduct of appellant, is sufficient to prove that the parties formed a definite intention to enter into a partnership relation, and that the business between them was carried on pursuant to this agreement and understanding. It is not claimed there was any stipulation between the parties that they should not divide the losses (Civ. Code, sec. 2404), and, as already stated, the court charged to each of the parties one-half of $2,033.87, the amount of the loss on high-line ditch No. 5.

11. There is no merit in appellant's next contention that the failure of the court to make findings within the meaning of section 632 of the Code of Civil Procedure, prior to the taking of the account, was error. We quote from the rec-

ord: "The court announced that it would find in favor of the plaintiff as to the existence of a partnership . . . as to the real estate business and also in the town site." [6] It was clearly within the discretion of the court to make the findings on the issue of partnership either before or after the accounting was made.

12. Appellant complains of the action of the court in modifying the judgment after the entry thereof and while the motion for a new trial was pending. The modification was made upon the offer of respondent to waive $2,033.87, the amount of the loss on the high-line ditch for which respondent was given credit in schedule 8, and which the court in the judgment also directed be paid out of the partnership funds. In other words, the double credit to respondent for the amount resulted in appellant having to stand his share of the loss twice. [7] But as the modification was in favor of appellant, he will not be heard to complain.

13. In the final paragraph of appellant's opening brief it is stated the exceptions to the rulings on the admission and rejection of evidence "are all urged and not waived." This refers to some 105 rulings, many of them relating to the issue of partnership, the evidence to establish which we have found to be sufficient. The rulings are not otherwise specified, but even if, in particular instances, they were erroneous, it cannot be maintained appellant was prejudiced thereby.

The judgment is reversed, and the cause remanded for a new trial upon the issues as to the Hendricks deal only. With respect to the issues as to the partnership and all the issues relative to the accounting except those relating to the Hendricks deal, the findings as heretofore made by the court below shall stand as made, and after a new finding upon the issues as to the Hendricks deal the court below, upon a consideration of all the findings, shall enter judgment thereon dissolving the partnership and settling the entire account as before, except that as to the Hall-Sutton, Bergon-Antes, Easton-Mitchell, and the Flicker items of the account the judgment be in accord with the views expressed in this opinion, and as to the Hendricks deal in accord with

the new findings thereon.    Appellant shall recover costs of this appeal.

Shaw, J., Olney, J., Angellotti, C. J., Wilbur, J., Lennon, J., and Sloane, J., concurred.

Rehearing denied.

All the Justices concurred.