[S. F. No. 6223.    Department Two.—July 3, 1914.]

## HARTLAND LAW AND HERBERT E. LAW, Respondents, v. SAN FRANCISCO GAS AND ELECTRIC COM-PANY (a Corporation), Appellant.

CONTRACT—FURNISHING STEAM FOR THREE BUILDINGS—PARTIAL AS-SIGNMENT OF CONTRACT TO PURCHASER OF TWO OF BUILDINGS—CON-SENT TO ASSIGNMENT—NOVATION.—A contract which obligates the promisor, for a specified time, to furnish steam for heating three sep-arate buildings belonging to the promisee, is not of such a character that it may not be divided by consent of the parties; and a partial assignment of the contract by the promisee, with the consent of both parties, to a purchaser of two of the buildings, operates as a novation under section 1531 of the Civil Code, and the promisor continues under the obligation of furnishing steam to the other building.

ID.—DESTRUCTION BY FIRE OF TWO BUILDINGS SOLD—EXCUSE OF PER-FORMANCE.—In the absence of any provision in the contract to a contrary effect, the obligation of the parties to perform was not dependent upon the continued existence of the three buildings, and performance was not excused by the accidental destruction by fire of the two buildings sold.

ID.—INEVITABLE ACCIDENT—ACT OF GOD—EXPRESS CONTRACT TO DO LAW-FUL THING.—As a general rule, where a person actually contracts to do a certain lawful and not impossible thing, neither inevitable accident nor those events denominated acts of God will excuse him, the reason being that he might have provided for such contingencies by contract.

ID.—PARTIAL ASSIGNMENT RELIEVED ASSIGNOR OF PRO TANTO OBLIGA-TION TO PAY FOR STEAM.—Where there was no stipulation in the contract obligating the owner of the three buildings to pay for all of the steam furnished at all events, the general assignment of the contract, so far as it affected and applied to the two buildings sold,

carried with it the obligations and benefits relating to the entire subject matter of the agreement so far as those two buildings were involved, and relieved the assignor from the obligation to pay for steam furnished such buildings.

Id.—Continued Existence of Steam Plant—Obligation to Furnish Steam Not Dependent on.—The obligation of the promisor to furnish steam was not dependent upon the continued existence of its steam plant, there being no provision in the contract to that effect.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco entered in accordance with an award of arbitrators and from an order refusing to vacate such award. J. M. Seawell, Judge.

The facts are stated in the opinion of the court.

Wm. B. Bosley, for Appellant.

Edgar C. Chapman, for Respondents.

MELVIN, J.—Defendant appeals from a judgment entered in accordance with the award of arbitrators and from an order of the superior court refusing to vacate said award.

On or about the twentieth day of July, 1905, the plaintiffs entered into a contract with the defendant corporation by which the latter agreed to furnish steam for heating the "Monadnock," "Rialto" and "Crossley" buildings situated in the city and county of San Francisco. At that time plaintiffs owned all three of these buildings. The steam was generated at the manufactory of defendant known as "Station C," and under the terms of the contract was to be delivered at a designated point to the pipes of plaintiffs running to said buildings. The corporation agreed to furnish steam for twenty-four hours a day at an approximate pressure of one hundred pounds and payment was to be made at the rate of one cent per cubic foot of distilled water returned through meters from the heating systems. The life of the agreement was to be ten years. Under this contract steam was delivered and paid for. On the sixteenth day of March, 1906, plaintiffs conveyed the Rialto and Crossley buildings to Mrs. Theresa A. Oelrichs. On that date the president of the San Francisco Gas and Electric Company, Mr. John A. Britton, wrote to Messrs. Tobin & Tobin, attorneys for Mrs. Oelrichs, consent-

CLXVIII Cal.—8

ing that the contract for the supply of steam might be assigned to her in so far as it related to the two buildings which she had purchased. The letter also contained the following paragraph:

"Should it be your client's desire to have a separate contract made upon the same terms, ending at the same period of time as the contract with Mr. Law, I shall be pleased, on behalf of the San Francisco Gas and Electric Company, to enter into such a contract at your pleasure."

On the seventeenth day of March, 1906, plaintiffs assigned the contract of July 20, 1905, in so far as it affected and applied to the Crossley and Rialto buildings to Mrs. Oelrichs, and the assignment was delivered to her. Said assignment has never been canceled or rescinded. Mrs. Oelrichs never accepted defendant's offer to enter into a separate contract regarding the two buildings which she had purchased from the Law brothers.

On the eighteenth day of April, 1906, in the great conflagration in San Francisco the Crossley and Rialto buildings were practically destroyed and the Monadnock building together with defendant's "Station C" were partly demolished. At the time of the arbitration the two buildings belonging to Mrs. Oelrichs had not been rebuilt but the plaintiffs had reconstructed the Monadnock building; had demanded steam from defendant and had been refused. "Station C," the only plant which defendant had owned prior to April 18, 1906, from which it could supply steam under its contract, had not been rebuilt with a view to continuing steam service. These and other facts were submitted to a board of arbitrators and the three following questions were, by said submission, propounded to them:

"(a) Was said contract of July 20, 1905, extinguished by reason of all or any of the facts herein recited and agreed upon? and

"(b) Was the further performance by the defendant of the said contract of July 20, 1905, excused by reason of all or any of the facts hereinbefore recited and agreed upon? and

"(c) If it shall be determined by said arbitrators that the said contract of July 20, 1905, was not extinguished, and that the further performance thereof by the defendant after the 18th day of April, 1906, was not excused by reason of all or any of the facts hereinbefore recited and agreed upon, then,

and in that event only, what is the amount of the loss and damage which the plaintiffs have suffered by reason of the defendant's failure and refusal to further perform said contract of July 20, 1905, and to furnish steam under and pursuant to the provisions thereof for the heating of said Monadnock building subsequent to the 18th day of April, 1906?''

The arbitrators took testimony; considered the matters involved and made a report in which the first two interrogatories were answered in the negative and the damages were fixed in the sum of $14,595.

Passing, without deciding, the contention that defendant's attack on the award and judgment entered thereon is not in accord with the provisions of section 1287 of the Code of Civil Procedure, we will consider the arguments of counsel for appellant upon the mistakes of law by which he insists the arbitrators failed properly to analyze the contract and to give the award which a proper analysis would have made inevitable. He relies upon the following propositions:

1. The contract of July 20, 1905, was in its nature entire and indivisible.

2. The obligations arising under said contract were contingent upon the continued existence of the three buildings, further performance being excused by the destruction of two of them.

3. The contract was rescinded by defendant's action in that regard because of partial failure of consideration resulting from destruction of two of the buildings.

4. The assignment to Mrs. Oelrichs did not modify the obligation of plaintiffs to take and pay for all of the steam necessary for the heating of the three buildings.

5. The obligations of the parties to continue performance of the contract were contingent upon the existence of defendant's steam plant and defendant was excused by the destruction thereof from further performance.

It is doubtless true, as appellant's counsel contends, that ordinarily when a contract is made with reference to several parcels of property belonging to one person, the obligations of the agreement will not be met by performance with reference to one of them. Thus in *Sterling* v. *Gregory,* 149 Cal. 118, [85 Pac. 305], where the defendant had agreed to purchase all of the oranges from three groves, all belonging to plaintiff, the sale by the latter of the fruit from two of the

orchards was held to be a breach of the agreement sufficient to support a rescission. In *McConnell* v. *Corona City Water Co.,* 149 Cal. 61, [8 L. R. A. (N. S.) 1171, 85 Pac. 929], this court held that the contract for driving a tunnel a certain distance was indivisible, but held, nevertheless, that where part of the tunnel caved in, by reason of the failure of defendant to furnish proper timbers, plaintiff might sue for the value of the work done and might obtain damages for loss of estimated profits. So in *Loudenback Fertilizer Co.* v. *Tennessee Phosphate Co.,* 121 Fed. 298, [61 L. R. A. 402, 58 C. C. A. 220], it was held that a contract for the sale of "all phosphate rock which should be needed for the ordinary requirements of plaintiff's factory," was a single contract and not a number of agreements for the sale of definite quantities of rock as ordered from time to time.

*Norrington* v. *Wright,* 115 U. S. 188, [29 L. Ed. 366, 6 Sup. Ct. Rep. 12], involved a contract for the delivery of five thousand tons of rails, one thousand tons during each of five specified months. It was held that partial default in delivery affected the entire contract. But in none of these cited cases was there involved a partial assignment of the contract with the assent of both parties. Respondents insist that the partial assignment to Mrs. Oelrichs with the consent of the defendant amounted to a novation. Appellant's position is that it assented only to the assignment of the *benefits* of the contract without consenting to the relief of plaintiffs from the *obligations* thereof. But, as respondents insist, they had the right to make such an assignment without the consent of the other party to the agreement. There can be little doubt that the intention of the defendant was to release the Laws and to substitute their vendee as to that part of the contract relating to the buildings purchased by her. The offer made by the president of the corporation to enter into a separate contract with her for the supply of steam to her two buildings indicates unerringly such intention. It is argued that Mrs. Oelrichs's failure to accept the offer of a separate contract prevented novation; but the plaintiffs would not have been parties to that new agreement, and if the position of appellant is correct, their original contract was held in suspense until the action of Mrs. Oelrichs and defendant in entering into a new agreement of which they, the plaintiffs, might have no knowledge. The letter of the president of the defend-

ant corporation to Mrs. Oelrichs was accepted in all particulars by the plaintiffs because the assignment of a part of the contract to their vendee was indorsed upon it. In effect that letter said to them and to her: "This corporation will allow the Law brothers to substitute their vendee for themselves in that part of the agreement relating to the 'Rialto' and 'Crossley' buildings, and if she wants a more formal substitution we will make a new contract with her." The transaction was a novation under section 1531 of the Civil Code. By the terms of the original agreement the defendant corporation was empowered to use the pipe system of plaintiffs if necessary in delivering steam to other customers. If such deliveries had been made, could the company have refused to furnish steam to the three buildings originally owned by the plaintiffs because the other customers had declined to accept delivery after the fire? Assuredly not. The assignment with defendant's consent of the contract for steam to heat the "Crossley" and the "Rialto" and the offer by defendant to execute a separate contract with Mrs. Oelrichs had the effect of making her a customer of the San Francisco Gas and Electric Company just as if she had caused that corporation under that contract to make connections of its steam pipes between the system of plaintiffs and some building not included in the original scheme. In other words, the "Crossley" and "Rialto" buildings were placed in the same category with newly connected buildings. There was nothing in the original contract limiting the activities of the corporation to the supply of steam to the three buildings of the Law brothers. On the contrary there was provision for extension, if need be, of the defendant's business of steam supply. In the conduct of such business there would be no essential indivisibility of the subject matter of the various agreements preventing their assignment, with the consent of the company furnishing the steam, whenever a building connected with the system should be sold. We cannot say that the contract was one, the subject matter of which might not be divided by consent of the parties.

It is argued that the obligation of the parties to perform the contract of July 20, 1905, depended upon the continued existence of the three buildings and that performance was excused by the destruction of two of them. In this behalf appellant cites such authorities as *Taylor* v. *Caldwell*, 3 B.

& S. 833, [122 Eng. Reprint, 309], where the rule is thus announced:

"There seems no doubt that where there is a positive contract to do a thing not in itself unlawful, the contractor must perform it or pay damages for not doing it, although in consequence of unforeseen accidents the performance of his contract has become unexpectedly burthensome or even impossible. . . . But this rule is only applicable when the contract is positive and absolute and not subject to any condition either express or implied, and there are authorities which, as we think, establish the principle that where, from the nature of the contract, it appears that the parties must from the beginning have known that it could not be fulfilled unless when the time for the fulfillment of the contract arrived some particular specified thing continued to exist, so that, when entering into the contract, they must have contemplated such continuing existence as the foundation of what was to be done; there, in the absence of any express or implied warranty that the thing shall exist, the contract is not to be construed as a positive contract, but as subject to an implied condition that the parties shall be excused in case, before breach, performance becomes impossible from the perishing of the thing without default of the contractor."

The facts in that case were quite different from those involved here. One party to the contract agreed to give to the other the use of a certain music hall on specified days. By the accidental burning of the hall both parties were discharged from the contract. There is nothing in the contract before us, either express or implied, which brings it under the rule in *Taylor* v. *Caldwell* and similar authorities cited by appellant. *Dexter* v. *Norton*, 47 N. Y. 63, [7 Am. Rep. 415], cited in this behalf, is easily distinguishable from the case at bar. In the opinion in that case it was held that an obligation to deliver specific articles of personal property,—namely, certain designated bales of cotton, was excused by the destruction of the property by fire without fault on the part of the vendor. The general rule, however, was there declared to be that where a person actually contracts to do a certain lawful and not impossible thing, neither inevitable accident nor those events denominated acts of God will excuse him, the reason for the rule being that he might have provided for such contingencies by contract. In *Lorillard* v. *Clyde*, 142

N. Y. 458, [24 L. R. A. 113, 37 N. E. 489], the court was considering a contract by which certain dividends of a corporation were guaranteed. Dissolution of the corporation without fault of either party was held a sufficient reason for failure to perform. The agreement between the parties in the case now under discussion was drawn in anticipation of the possibility of interruption in the service by reason of fire or other destructive force, yet no provision was made for abrogation of the contract as the result of such event. The paragraph on this subject is as follows:

"This company will not be responsible for interruptions of said service due to municipal interference, strikes, fires, actions of the elements, or causes beyond its control, but will endeavor to furnish an uninterrupted supply."

It is contended that the partial assignment of the contract did not operate to relieve the assignors from the obligation to pay for steam for the three buildings and in this behalf an attempt is made to draw an analogy between this agreement and a lease. It is true that authorities are not wanting for the proposition that the assignment of a lease, even with the lessor's consent, does not necessarily relieve the lessee from the liability for any breach of covenant or condition contained therein. (*Clarke* v. *Cummings*, 5 Barb. (N. Y.) 339; *Jackson* v. *Clark*, 7 Johns. (N. Y.) 227.) But in a lease there is ordinarily a privity of estate and a privity of contract between lessor and lessee; therefore the assignment of the lease, considered as an estate in land, does not necessarily carry with it the assignment of an express covenant to pay rent. In this contract there was no stipulation for payment by plaintiffs for all of the steam furnished at all events. They were to pay for all the steam delivered at the three buildings, but the general assignment of the contract, so far as it affected and applied to two of the buildings carried with it the obligations and benefits relating to the entire subject matter of the agreement so far as those two buildings were involved. There was no privity of contract as distinguished from privity of estate, and consequently no analogy between this assignment and the transfer of the ordinary lease.

Appellant's counsel insists that continued existence of the steam plant, as well as continued existence of all the buildings were conditions and essential parts of the existence of the contract of July 20, 1905. This argument is met by the clause

quoted above in which interruption of the service by fire or other destructive agency is excused but not made the basis for the termination of the *status* of the parties.

We conclude, therefore, that the contract was severed by the act of the parties on March 17, 1906, culminating in the assignment to Mrs. Oelrichs of the part relating to the two buildings which she had purchased; and that this severance resulted in a novation. The contract was then not one depending solely upon the continued existence either of all of the buildings or of the steam producing machinery at defendant's "Station C." It follows that plaintiffs were entitled to an award of damages for the refusal of the San Francisco Gas and Electric Company to continue to furnish steam to the Monadnock building, on account of which they were obliged to make expensive changes in their heating system. It is not asserted that, if the defendant was bound to continue furnishing steam to plaintiffs as requested, the amount of damages fixed by the arbitrators was excessive.

The judgment and order are, therefore, affirmed.

Lorigan, J., and Henshaw, J., concurred.

Hearing in Bank denied.