[S. F. No. 9923. In Bank.—August 1, 1923.]

## S. L. JONES & CO. (a Corporation), Respondent, v. VINCENT BOND, etc., Appellant.

[1] CONTRACTS — DELIVERY OF STEEL BARS—PERFORMANCE—CONSTRUCTION.—Where the parties to a contract, which provided for the delivery by the seller to the buyer of a stated quantity of steel bars of a specified size at a certain price and for the time of shipments, inserted on the face of the contract, under the printed heading "Terms," the words "To be arranged," and later a bank, pursuant to an arrangement between the parties, issued a letter of credit authorizing the seller to draw on the bank at sight for and on account of the buyer for not exceeding in all a stated sum covering the agreed quantity of steel bars to be shipped by a par-

ticular mill, the fact that the mill mentioned in the letter of credit never commenced operations and produced no steel did not excuse delivery on the part of the seller, there being nothing in the contract between the seller and the buyer indicating or tending to indicate that it was the intent of the parties to limit the subject matter of the contract to steel which was to be fabricated at and by the mill named in the letter of credit, and the phrase "Terms, To be arranged," not meaning anything more than that the method and manner of payment were to be thereafter arranged.

[2] ID.—PAYMENT—CONSTRUCTION.—Where the parties to such contract did arrange and orally agree upon the terms of the payment, i. e., payment to be cash upon delivery of the steel f. o. b., such payment to be secured by a bank letter of credit, the letter of credit was not a part of the contract between the parties, but was only evidence of the fact that they had reached an agreement as to the one term not definitely agreed upon in the original agreement.

[3] ID.—PAYMENT—LETTER OF CREDIT—INDEPENDENT CONTRACT.—Whatever may have been the purpose of the bank in inserting in the letter of credit the phrase, "To be shipped by Port Moody Steel Works, Ltd.," the letter of credit was not part of the contract between the buyer and the seller, but was an entirely separate and independent contract between the bank and the seller.

[4] ID.—DELIVERY—PERFORMANCE—CONSTRUCTION.—If a party desires to be free from his obligation to deliver a commodity in the event of nonproduction by a particular concern, it is incumbent upon him to make a clear provision to that effect in his contract.

[5] ID.—ACTION FOR DAMAGES—FAILURE TO DELIVER STEEL—VERDICT—EVIDENCE.—In this action for damages for the defendant's breach of a contract caused by his failure to deliver steel bars to plaintiff, the evidence was sufficient to sustain the finding of the trial court as to the amount of damages suffered by the plaintiff.

[6] ID.—PLEADING — AMENDMENT — REFUSAL OF—ABSENCE OF PREJUDICE.—In such action, the defendant was not prejudiced by the trial court's refusal to allow an amendment to defendant's answer during the course of the trial for the purpose of showing an agreement to extend time for performance, where the trial court made findings upon the matters contained in the proposed amendment, and such findings were supported by the evidence.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Franklin A. Griffin, Judge. Affirmed.

The facts are stated in the opinion of the court.

Lent & Humphrey for Appellant.

Powell & Dow for Respondent.

LENNON, J.—The defendant in this action appeals from a judgment awarding damages to the plaintiff for an alleged breach of contract. The conceded facts of the case which constitute the basis of plaintiff's cause of action are these: On January 27, 1920, plaintiff and defendant signed an instrument, partly printed and partly typewritten, which provided for the delivery by the defendant to the plaintiff of 1,000 long tons of steel bars of a specified size at $3.90 per 100 pounds, f. o. b. Vancouver. Shipments were to be made in February, March, and April, subject to "Hunt's inspection, buyer's account." On the face of this instrument, under the printed heading "Terms," the parties inserted the words "To be arranged." Thereafter the parties arranged for a letter of credit, which was issued by the Bank of California on February 11, 1920. This letter of credit authorized the defendant to draw on the bank at sight for and on account of the plaintiff "for any sum or sums not exceeding in all $92,000.00 U. S. currency covering 1,000 long tons steel bars (Order No. 83) to be shipped by Port Moody Steel Works, Ltd., Port Moody, B. C., on or before April 30, 1920."

No steel was ever delivered, and it is for this failure to deliver that damages were sought and recovered. Defendant contends that the instrument of January 27, 1920, is insufficient in and of itself to constitute either a formal contract between the parties or a memorandum, under the statute of frauds, for the reason that it affirmatively appears from the phrase "Terms. To be arranged" in said instrument contained, that the terms of credit or payment were not agreed upon, but were to be the subject of future negotiations between the parties.

It is to be noted that defendant does not claim that there was no contract whatever between the parties. The defendant, however, denies that any contract was established as of January 27, 1920, but claims that the terms of payment were agreed upon and settled by subsequent arrangements between the parties and that a binding contract thereupon came into existence. One of the terms of this contract, so the defendant argues, was that payment should be made only

for steel shipped by the Port Moody Steel Works. With this fact as a basis the defendant contends for the conclusion that inasmuch as the Port Moody Steel Works never commenced operations and produced no steel, delivery by defendant under the contract was excused.

[1] Even if it be conceded that the first portion of the defendant's contention be correct, namely, that the terms of payment subsequently agreed upon must be considered as a part of the contract ultimately consummated, and assuming that, had the parties relied exclusively upon production by a specified mill for performance, the failure of such mill to operate would have excused delivery, nevertheless we are of the opinion that the defendant's contention cannot be maintained. This must be so, we take it, for the reason that we find nothing in the contract between the *seller* and the *buyer* indicating or tending to indicate that it was the intent of the parties to limit the subject matter of the contract to steel which was to be fabricated at and by the Port Moody mills.

The contract of January 27, 1920, between the parties was entire and complete on its face except as to the terms of payment thereafter to be arranged. It will be noted that no mention is made in the instrument executed on that date of the Port Moody mills or of any other place of production, nor do we find any other *indicia* that these mills were exclusively in the minds of the parties. The phrase ''Terms. To be arranged'' cannot by even the most liberal construction be construed to mean anything more than that the method and manner of payment was to be thereafter arranged. Obviously it was not intended to nor did it include the idea that there was open to settlement the question of where the steel should be obtained. The written instrument of January 27, 1920, therefore, contained all the details of the agreement for the purchase and sale of the steel with the exception of the method of payment to be later agreed upon. [2] Thereafter the parties did arrange and orally agree upon the terms of the payment, i. e., payment to be cash upon delivery of the steel f. o. b., such payment to be secured by a bank letter of credit. That these were the terms of payment subsequently agreed upon is evidenced not by the letter of credit, but by the fact of the issuance of the letter of credit. The letter of credit was not, therefore, a

part of the contract between the parties, but is only evidence of the fact that they had reached an agreement as to the one term not definitely agreed upon in the original agreement. This oral agreement as to the manner and method of payment, together with the written instrument of January 27, 1920, constituted the contract as ultimately agreed upon between the seller and the buyer.

[3] The bank in issuing its letter of credit inserted therein, "To be shipped by Port Moody Steel Works, Ltd." Whatever may have been the purpose of the bank in inserting this phrase in the letter of credit, the letter of credit was not part of the contract between the buyer and the seller, but was an entirely separate and independent contract between the bank and the seller. (*American Steel Co.* v. *Irving Nat. Bank,* 266 Fed. 41; *Bank of Taiwan* v. *Gorgas-Pierie Mfg. Co.,* 273 Fed. 660; *Frey & Son, Inc.,* v. *Sherburne Co.,* 193 App. Div. 849 [184 N. Y. Supp. 661].) And although the seller might have refused to accept a letter of credit in that form, the delivery and acceptance of the letter of credit did not constitute a modification of the contract between the seller and the buyer. In other words, the result of the dealings was that the seller remained obligated to furnish the steel contracted for from whatever source he could obtain it, and that the buyer remained obligated to pay for the steel upon delivery, since these were the obligations imposed by the contract between the seller and the buyer as embodied in the written instrument of January 27, 1920, and the subsequent oral agreement as to the manner and method of payment. The seller, by reason of the insertion by the bank in the letter of credit of the phrase "To be shipped by Port Moody Steel Works, Ltd.," could not claim payment from the bank unless the steel was delivered f. o. b. cars at Port Moody. This circumstance, however, did not relieve him from his obligation under his contract to furnish the steel to the buyer. [4] If a party desires to be free from his obligation to deliver a commodity in the event of nonproduction by a particular concern, it is incumbent upon him to make a clear provision to that effect in his contract. (*Law* v. *San Francisco Gas etc. Co.,* 168 Cal. 112 [Ann. Cas. 1915D, 842, 142 Pac. 52].) Because of the absence of such a provision in the contract herein sued upon we conclude that the defendant was not legally excused from perform-

ance of the terms of the contract by the failure of the Port
Moody mills to open and operate.

[5] It is further contended by the defendant that the
evidence does not sustain the finding of the trial court as to
the amount of damages suffered by the plaintiff. The meas-
ure of the damage caused by a breach of an agreement to
sell personal property, not paid for, is deemed to be the
excess, if any, of the value of the property to the buyer
over the amount which would have been due to the seller
under the contract if it had been fulfilled, and in estimat-
ing such damages the value of the property to the buyer is
to be deemed the price for which he might have bought an
equivalent thing in the market nearest to the place where
the property ought to have been put in his possession. (Civ.
Code, secs. 3308, 3354.) The testimony of several witnesses
for the plaintiff was that the market price of steel at Van-
couver upon the final date for delivery was $4.60 per 100
pounds. But the defendant insists that this market price
was arrived at by the witnesses by adding to the Pittsburg
market price the cost of transportation, and that the actual
price at Vancouver was considerably less than this price.
It is, of course, a well-settled economic principle that in
order to successfully compete with other manufacturers offer-
ing the same commodity a manufacturer must quote prices
as low as his competitor, otherwise he will not get the busi-
ness. If, therefore, the market price at Vancouver was
lower than the total of the price quoted by eastern manu-
facturers of steel plus the cost of transportation to the coast,
purchasers of steel at Vancouver would not purchase the steel
from the eastern mills and these mills would be forced to
lower their price or leave the field. One of the witnesses
for the plaintiff, who was the Pacific Coast representative
for twelve eastern mills, testified that these eastern mills
were competing with mills on the coast and that because
of the competition the eastern mills were forced to quote
the lowest price they could. He also testified that the
prices quoted by the mills he represented were not inter-
fered with by the offering of steel at a lower price than
his mills were offering steel. It follows, therefore, that the
price of $4.60 per 100 pounds, which was the price quoted
by the eastern mills at Pittsburg, plus the cost of transpor-
tation, must have been as low as the price of steel offered

by local mills on the Vancouver market. This evidence was, therefore, sufficient to support the award of the trial court of $14,560 damages based upon the market price for steel at $4.60 per 100 pounds at Vancouver.

It may be well in passing to note that inasmuch as the market price of steel at Vancouver was quoted by witnesses for plaintiff in terms of United States money, it is, of course, clear that the Canadian rate of exchange and the value of the Canadian dollar has no bearing on the question.

[6] Defendant was not, in our opinion, prejudiced by the trial court's refusal to allow an amendment to defendant's answer during the course of the trial for the purpose of showing an agreement to extend time for performance. The court made findings upon the matters contained in the proposed amendment. These findings are supported by the evidence. The judgment appealed from is affirmed.

Waste, J., Myers, J., Seawell, J., Lawlor, J., Kerrigan, J., and Wilbur, C, J., concurred.

Rehearing denied.