[Civ. No. 5868. First Appellate District, Division One.—January 18, 1929.]

SAN JOAQUIN LIGHT AND POWER CORPORATION, Respondent, v. JOHN COSTALOUPES et al., Appellants.

Frank W. Taft and John E. Tsarnas for Appellants.

F. H. Pearson for Respondent.

PARKER, J., *pro tem.*—In this action plaintiff corporation sought to recover from defendants a certain sum of money alleged to be due under contracts for the furnishing of light and power by plaintiff, a public service corporation, to defendants. At the trial the action was dismissed as against all of the defendants, excepting the defendant John E. Tsarnas. The case was tried by the court, sitting without a jury, and judgment was rendered in favor of plaintiff as prayed. A recital of the facts, upon which there is no conflict, will better illustrate the nature of the case and the contentions here made. On May 13, 1921, a written agreement was entered into by and between plaintiff and Costaloupes Company, the terms of which may be summarized. The Costaloupes Company is called the consumer and the San Joaquin Light and Power Corporation is called the company. The company agrees to furnish and the consumer agrees to take, use, and pay for electrical energy from the company's system for the term of three years from June 28, 1921, to June 28, 1924, during the continuous period from January 1st to December 31st as it occurs in said period, for the operation of a fifteen horse-power motor located on premises described as south end quarter of a certain section. Provided, however, that the consumer shall guarantee $394 per annum, as per schedule of rates effective. Provided that the consumer may, upon notice prior to the expiration of the term, discontinue the service, and unless such notice is given the contract shall continue from year to year, subject to cancellation by notice of thirty days prior to the expiration of each year. Any notice the company may give to consumer to

be addressed to 720 Harrison Street, San Francisco, and notice so addressed and deposited with postage prepaid shall be deemed sufficient notice. The contract to bind successors of the parties and the word "consumer" to include all purchasers of power by whom this agreement is executed and bind them jointly and severally. The contract was executed by one Henry B. Davidson in behalf of Costaloupes Company, as manager thereof. On June 11, 1921, another contract was entered into between the same parties, in writing, covering the same period of time. This contract permitted the purchase of electrical energy for the operation of lights located upon southeast quarter of the section referred to in the previous contract. This contract provided that the consumer shall guarantee $39 per annum. The contract contained all of the provisions of the earlier contract and was likewise executed by Henry B. Davidson, as manager on behalf of the consumer. It is a stipulated fact that before the twenty-eighth day of June, 1921, the Power Corporation expended the sum of $1,299 in building and constructing an electrical and transmission line for the service of electrical energy to the premises of Costaloupes Company, and that said money was expended and said line built pursuant to the contracts hereinafter referred to, and, further, it is stipulated that the service of electrical energy by plaintiff was actually commenced upon the premises on June 28, 1921. It was further stipulated that the line had been maintained at all times up to June 28, 1924, and up to the date of trial, and that the Power Corporation had received no payment. It is also stipulated that the total amounts guaranteed in the contracts equals the sum expended, namely, $1,299.

It was alleged in the complaint, not denied by defendant, and found by the court to be a fact that, on or about July 8, 1921, the factory, buildings, and machinery composing the manufacturing plant of defendants, for the operation of which plant electrical energy, power, and lights were to be provided, was destroyed by fire, and that defendants have not rebuilt, nor do they intend to rebuild, and that since May 13, 1921, defendants have failed, neglected, and refused to take delivery of or use electrical energy from plaintiff's system. It was also found that the plaintiff has fully performed its obligations under the contracts and

was at all times ready, able, and willing to perform. The complaint was filed January 26, 1923, and the action brought to trial December, 1926. Appellant urges three reasons why the judgment of the lower court should be reversed. We arrange these in a different order than appellant presents them. Appellant contends: First. That the defendants were excused from performance by the destruction of the subject matter. Second. That the court erred in applying the measure of damages in that the contracts were for the sale of personal property, wherein delivery was not made and the title still remained in the vendor. Third. That the court erred in finding that defendant John E. Tsarnas was a member of the firm of Costaloupes Company. On the first ground appellant urges that the contract was to deliver power and light to defendants for the purpose of electrifying the cheese factory building and plant owned and conducted by the latter. It may be here noted that while the pleadings admit and the court finds that the contract was entered into for the furnishing of light and power for a manufacturing plant, yet the contract itself merely provides for the delivery of electrical energy to a certain described quarter-section of land. The allegations and findings do not alter or in any way affect the contract. At the most it would simply determine the fact to be that when the contract for power and lights was made it was the intention of the consumer to use the energy in and about the premises used as a manufacturing plant. It is obvious that the subject matter of the contract was the sale and delivery of electrical energy to the consumer, irrespective of its use. In many respects it parallels the situation where a manufacturer contracts to buy raw material and subsequent to the contract the factory is destroyed. It would not be contended, in the absence of a specific provision covering, that the buyer would be discharged of his obligation under the contract. Appellant cites many cases in support of his contention, but these cases simply repeat the familiar rule as set forth in California Jurisprudence, volume 6, at page 443, which is as follows: "Where from the nature of the agreement it is evident that the parties contracted on the basis of the continued existence of the person or thing to which it relates, the subsequent perishing of the person or thing will excuse

performance. Thus where the contract relates to the use or possession in any dealing with specific things and performance necessarily depends on the existence of the particular thing, the condition is implied that the impossibility arising from the perishing or destruction of the thing, without default in the party, will excuse performance, because, from the nature of the contract, it is apparent that the parties contracted on the basis of the continued existence of the subject thereof.'' We think the facts here do not warrant the application of the rule, nor does the contract. All that appears here is that by reason of the premises the defendants could not use any more power or light in these particular buildings, but if at any time they chose to rebuild or make other use or application of the light and power they could have enforced their right of delivery of electrical energy. (See *Law* v. *San Francisco Gas Co.*, 168 Cal. 112 [Ann. Cas. 1915D, 842, 142 Pac. 52]; *Field Co.* v. *Haven*, 36 Cal. App. 669 [173 Pac. 108].) The gist of the allegation in the complaint and the essential finding is that defendants failed and neglected to take delivery of or use electrical energy from plaintiff's system under the said contracts. The effect of the finding of the destruction of the premises and factory on the land described whereon delivery was to be made was merely to demonstrate the lack of any substantial 'or legal reason justifying such failure or to excuse performance. There is nothing in the contract to indicate that the parties contemplated that no amount should become due from consumer in the event that the manufacturing establishment ceased to exist; the contracts with plaintiff plainly imposed an obligation on the consumer to pay the amount specified whether or not electrical energy was used. We find no merit in this, the appellant's first ground of appeal.

█ The next point urged is that whatever construction may be placed upon the contract it must be held that the entire transaction was nothing more than an agreement of sale of personal property. In this view of the contract appellant urges that the measure of damages ensuing from a breach is set out in section 3311 of the Civil Code. Without quoting the section here, the appellant, relying on the provisions thereof, argues that the trial court should have inquired and found whether or not there had been a

resale of the electrical energy contracted for, and that the difference between the net moneys obtained in case of a resale and the contract price would be the measure of damages, or in case of no resale then the damage as set forth in subdivision 2 of section 3311 of the Civil Code would apply. We do not think this point merits the detailed discussion accorded. Quoting from the brief of respondent, we would be interested to know how appellant herein could determine the amount of electrical energy which defendant refused to take and which, therefore, under his contention, respondent should have sold to others—in other words, how the facts in this case could be determined according to the measure contended for upon which to compute the damages. It is a fact, agreed upon, that in pursuance of the contract the Power Corporation did expend in the construction of its line the exact amount of money guaranteed as a minimum for electrical energy which defendants would take during the period of the contract. When the corporation agreed to deliver light and power to the consumer the latter guaranteed to the company the sum of $433 each year. The case of *Marin Water Co.* v. *Town of Sausalito,* 168 Cal., at page 603 [143 Pac. 774], discusses the identical question here presented. In that case it was said: "Respondent assigns as a reason why its demurrer was properly sustained, the failure of the complaint to set forth the damage suffered by appellant, which, according to respondent's theory, should be measured by section 3311 of the Civil Code as to the difference between the contract price and the value to the water company of the water which the town of Sausalito did not take. The contract with which we are here concerned, however, is not the usual agreement to accept and pay for personal property. It is, as we have shown, one of that class of agreements in which one of the parties promises to pay a minimum sum for a commodity at a fixed rate, such amount to become due whether enough of the commodity to equal such minimum price at the agreed rate is required or not. Such agreements have been upheld and the minimum rate has been sustained as the true measure of recovery, the promise to pay such sum being a part of the direct obligation of the contract and in no sense a covenant for liquidated damages in cases of breach." The quoted case

cites, in support of the holding, the following cases: *Beck* v. *Indianapolis Light & Power Co.*, 36 Ind. App. 600 [76 N. E. 313]; *Klosteman* v. *United Electric etc. Co.*, 101 Md. 29 [60 Atl. 252]. In the case of *Field Co.* v. *Haven*, 36 Cal. App. 669 [173 Pac. 108], admittedly *dictum*, the court says (paraphrasing): "Appellant contends that the guarantee clause in the contract was void as providing for liquidated damages. As the point was raised in the court for the first time on oral argument, we are not required to discuss or decide it. We may state, however, that in our opinion the clause provides not for liquidated damages, but for a minimum compensation to defendant for the service to be rendered by him during the year for which he was employed." In Curtis on the Law of Electricity, section 116, it is said: "A valid contract may be entered into between an electric company and a consumer requiring the payment of a minimum charge. Under such a contract the customer is bound to pay such minimum though he consumes no current at all. The provision requiring the payment of the minimum charge is a part of the direct obligation of the contract and cannot be construed as an agreement for liquidated damages." Appellant cites with much assurance the earlier case of *Terrace Water Co.* v. *San Antonio Co.*, 1 Cal. App. 511 [82 Pac. 562]. This case adopts the resuming of the Civil Code sections, thus: Anything that may be owned is called property (sec. 654) and there may be ownership of all inanimate things which are capable of appropriation or manual delivery (sec. 655). Every kind of property that is not real is personal (sec. 633). From these sections the court concluded that electrical energy was personal property. The action was one wherein the consumer was denied power agreed to be furnished and he was required to purchase power elsewhere and was allowed as damages the extra cost over and above the contract price in the original agreement. The court points out that this was the minimum of damage, inasmuch as the injured party did not permit special damage to his lands by reason of lack of water, but secured power for pumping elsewhere thus, mitigating his damage, as was within his power to do. This review of the case demonstrates its inapplicability to the case at bar. A careful reading of the Terrace Water Company will show that the

court had no intention of establishing a doctrine such as contended for here but merely allowed the plaintiff therein the exact loss to plaintiff. Under the authorities previously cited we see no reason to disturb the judgment.

The third point raised by appellant goes to the liability of defendant John E. Tsarnas. Appellant, for this branch of the case, is willing to concede the correctness of the court's finding and judgment in all other features of the case. But, he claims, the liability thereunder rests in the other defendants, contending that he, Tsarnas, was not a partner or at all connected with the others, save as a general creditor. The question thus presented hinges upon the construction of a written contract before us. No point is made on ostensible partnership, nor is claim made that Tsarnas, by his acts or conduct, led plaintiff or third parties generally to believe that a partnership existed. It may be stated that both parties concede that the determination of whether or not a partnership existed must result from a construction of the contract itself and the recitals therein contained. The contract referred to is a contract entered into on April 1, 1921, being at a time previous to the execution of the contracts between plaintiff and Costaloupes Company. This contract may be summarized as follows: The parties to the contract are John Costaloupes and Zetelia Costaloupes, described as doing business under the firm name of ''Costaloupes Company,'' the parties of the first part, and John E. Tsarnas, party of the second part. The agreement recites that the Costaloupes are indebted to Tsarnas on a note and mortgage in the sum of $20,500 and other sums in an open account, the total of the latter sums being not known. Recites further that the parties of the first part desire to secure $15,000 more, in addition to the present indebtedness, for the purpose of purchasing milk, supplies and operating expenses, and that Tsarnas is willing to loan and advance the desired sum upon the terms thereafter set out in the contract. In consideration of the premises the parties agree as follows: The Costaloupes are to ship and consign to Tsarnas, and in his name, all of the cheese manufactured by them at their plant to Tsarnas' warehouse in San Francisco, being located at 720 Harrison Street, San Francisco. Tsarnas is to sell the cheese at the market price, in as large quan-

tities as consistent with market conditions, and is to properly keep and care for the cheese, without, however, being an insurer, and will make account as and when the cheese is sold. The Costaloupes will continuously manufacture cheese unless it be agreed between the parties to the contract that market conditions do not justify further manufacture. The Costaloupes on the first day of each month will render an account to Tsarnas or his representative at San Francisco, or such other place as may be designated by him, showing all purchases made and debts incurred for the purchase of milk supplies, labor, etc., in the manufacture of the cheese. Tsarnas shall collect for all the cheese sold and deposit the money in the bank, together with the $15,000 herein agreed to be loaned, or as much thereof as shall be necessary to pay the operating expenses, and Tsarnas shall, on the first day of each month, render account of his sales and receipt of the expenses of storage, sale, etc. All of the expenses connected with the manufacture and the storage and sale shall be paid by check drawn on the funds deposited, which checks shall be signed by John Costaloupes, representing the parties of the first part, and by H. B. Davidson, representing Tsarnas. After the payment of all expenses then the Costaloupes family, three in number, shall receive a total wage of $5,000 per year and Davidson or other person selected as representative for Tsarnas shall be paid $3,000 per year. After all of these expenses and wage allowances have been paid, the surplus shall be divided equally between the Costaloupes on one side and Tsarnas on the other. The agreement was to continue for one year. All bills were to be paid monthly and the surplus to be divided monthly. During the life of the contract the Costaloupes shall *not* be required to pay any interest on this money owing to Tsarnas, either on the note or mortgage or on the amounts advanced under the contract or upon the sum previously due under the open account. The contract is not to affect, in any manner, the note and mortgage, save that no interest shall be paid thereon, and no foreclosure shall be sought during the term of the contract unless Tsarnas should deem foreclosure necessary to protect his rights against the claim of a third person. Neither party to be liable for debts contracted for by the other. It is agreed further that all of

the moneys advanced to the Costaloupes is advanced as a loan and not as a contribution to the business and the receipt of one-half of the net profits of said business is in lieu of payment of interest upon said indebtedness. It is expressly stated in the agreement that the parties thereto are not copartners. It may also be noted that the contract provided that in case of its termination before the expiration of the year, then Tsarnas might sell whatever stock he had on hand and apply the funds on the unsecured debt and have the right to proceed with the foreclosure of his mortgage. From this contract the issue as to the relationship between Tsarnas and the Costaloupes Company arises. There is no evidence of any acts or declaration on the part of Tsarnas, nor is there any question of an ostensible partnership created by such acts or conduct. There may be one exception to the statement and that is the fact of the representative of Tsarnas having executed, on behalf of Costaloupes Company, the contract for power and light out of which the controversy arises. Neither side makes comment on the fact and in so far as it may go on the present issue of partnership it is passed. It is the contention of appellant that the contract with Tsarnas establishes the fact of relationship of debtor and creditor and nothing further. It is likewise contended that the contract itself expressly negatives any idea of a partnership and expressly discloses the intent of the parties that the relationship should not be that of partners. We may concede that a relationship of debtor and creditor is shown and also that the contract expressly declares that the parties thereto are not partners. However, this does not establish the fact that the parties did not intend to create a partnership between themselves or as to a third person. The parties did intend to create exactly the relationship as shown by the contract, but did not intend that relationship to be called that of partners. Their intention in this respect is immaterial. Appellant and respondent here concede that if the contract by its terms establishes a partnership between the parties, the expressed intent that it should not be so classed would be of no avail. It is the intent to do these things which constitute a partnership that usually determines whether or not that relation exists between the parties. (*Chapman* v. *Hughes,* 104 Cal. 302 [37 Pac. 1048, 38 Pac. 109].)

Let us look again to the contract as a whole. The parties prior to the agreement stood in the position of debtor and creditor. A portion of the debt was secured and another portion, amount not stated, stood unsecured or in open account. As the parties stood nothing is disclosed that prevented Tsarnas from foreclosing his mortgage or enforcing collection of the debt not secured. These things, however, he did not choose to do. Tsarnas agreed to finance the continuation of the cheese factory. It is evident from the contract itself that the transaction was quite distinct from a mere loan. Without again detailing the promise of the contract it may be summed up as though Tsarnas and the Costaloupes met and Tsarnas thus addressed them: "I have a mortgage for some $20,000 on your cheese factory and plant and you owe me other sums of money unsecured. Go on and operate your factory and I will place $15,000 in the bank if that much is needed. Send all of your cheese to me and I will market it as conditions warrant and put the moneys thus obtained in the bank with whatever of the $15,000 it may require in addition thereto. If, after operating the plant, it appears to me it will not pay we may cancel this agreement. Any time I think it best to protect myself I can foreclose the mortgage but no interest will accrue on it during the time the cheese factory is running. I will put my agent there to manage the business with you and he shall receive $2,000 a year. All the bills shall be paid out of the moneys derived from the factory and if that is not sufficient then I shall advance the balance up to $15,000. Each month we will have an accounting and we will divide the profits equally between ourselves. It may be that I will not have to put up any money at all. Whether I do or not the one-half of the profits will be considered as being received by me as interest. In other words, for my financing or agreeing to finance the business, if we make it succeed, I am to get half of the profits." Having thus summarized the agreement we conclude that Tsarnas was not obligating himself to advance anything beyond one month's operation and that if the business paid he was not obligated in any sum, for the reason that if the moneys advanced for labor and material exceeded the amount, the relationship might be terminated. While, on the other hand, if the

moneys exceeded the advancement then the advancement was first to be liquidated before any profit could result or the monthly division made. We characterize the relationship, as did the court below, as that of partners. The contract created an association of these persons for the purpose of carrying on the business of manufacturing cheese and dividing the profits of that business between them. It contemplated united action in manufacturing cheese and in promoting sales thereof and the joint expense to be incurred thereby. This was sufficient to constitute the relationship of partnership. (*Chapman* v. *Hughes*, 104 Cal. 304, *supra.*) A right to participate in profits affords urgent, often conclusive, evidence that the trade in which the profits have been made was carried on in part for or in behalf of the person setting up such claim. It has also been held that the sharing of profits is *prima facie* evidence of the existence of a partnership. ▆ An agreement to divide the profits of a business implies an agreement for corresponding division of its losses, unless otherwise expressly stipulated. (Civ. Code, sec. 2404; *Welch* v. *Alcott*, 185 Cal. 761 [198 Pac. 626].) The courts will not countenance contrivances for giving persons the whole of the advantage of a partnership, without subjecting them to the liabilities, and an agreement which attempts to carry out a joint venture for the mutual profit of the adventurers and evade their responsibility for losses may be enforced and construed as creating a partnership. (20 Ruling Case Law, 833, and cases cited; 18 L. R. A. (N. S.) 1084.) Ruling Case Law, volume 20, page 828, with cases to support the text, declares the rule as follows: ''The distinction is drawn between lending money to the prospects of a business and contributing money and investing it as capital in the business. If the party investing the money is to be repaid out of the profits as profits and the amount to depend upon the business there is such a community as will create a partnership. The right of control or any voice in the control is considered an incident of proprietorship and the presence or absence may be of controlling weight. To frame a definition of any legal term which shall be both positively and negatively accurate, is possible only to those who, having legislative authority, can adapt the law to their own definition. (Lindley on Partnership, 2d Am. ed.,

1.) Since, therefore, the definition of a legal term, such as partnership, would be a legislative function, we may accept the definition of our code. Section 2395 of the Civil Code defines a partnership as the association of two or more persons for the purpose of carrying on business together and dividing the profits between them. In *Westcott* v. *Gillman,* 170 Cal. 568 [Ann. Cas. 1916E, 437, 150 Pac. 779], the court says: "In truth the existence or nonexistence of a partnership in any case cannot be determined by dissecting the whole relationship into broken parts and members and studying each disjointed fragment as though it were the complete whole."

Further, in passing upon the question of partnership in the same case, we find this significant language: "It is plain from the very terms of the agreement between these defendants that it measures up to the definition of a partnership as disclosed by section 2395, Civil Code. It was an association of two persons to carry on a definite business and to divide the profits and losses of that business." In *Wise* v. *Radis,* 74 Cal. App. 772 [242 Pac. 93], it is said, in speaking of a situation there presented: "Their joint venture was an association of two persons to carry on a definite enterprise and to divide the profits and losses. This, in general, constitutes a partnership." Almost the exact language appears in *Becker* v. *Turpin,* 61 Cal. App. 20 [214 Pac. 255]. Applying these authorities to the case at bar we find that the letter and spirit of the contract combined to manifest that its purpose was to carry on the business, rather than enforce a past indebtedness. The dominant characteristics of the contract was to carry on, and every provision of the contract was to this purpose. That it was to be carried on jointly is likewise clear. In the business venture involved there were two branches, as is necessary in all like undertakings, namely, manufacture and sale. In each of these branches the association and control of Tsarnas was provided for. The selling end was exclusively under his control and discretion, and the manufacturing end was under the joint control of the Costaloupes and the representation of Tsarnas, which representative was to be paid a salary greater than the proportionate salary of either of the others. The scope of the control and interest of Tsarnas can better be understood from the

fact that the agreement between the Power Company and the Costaloupes Company was executed on behalf of the consumer by the said representative, acting in the capacity of manager. If the transaction were as claimed, merely a naked loan, why do we not find some provision in the contract concerning the repayment thereof or the rate of interest chargeable thereon. Whatever may have been the relationship of the parties before the contract was entered into was immaterial. That there may have been a mortgage in favor of Tsarnas can be disregarded because none of his rights as mortgagee were affected unless perhaps the meaningless provision that he would forbear foreclosure only as long as he felt safe to do so. The anticipation of third party claims compelling or making expedient a foreclosure indicated the intention of carrying on the business as a thing separate from previous indebtedness or previous relations. Out of the profits there was to be no lessening of any debt or of any pre-existing debt. As far as the contract went the profits derived from the venture by Tsarnas were to be exactly as stated, namely, profits. The statement that these profits were to stand in lieu of interest would raise a question, namely, interest in what sum. The only answer is found in the contract provision that all the moneys advanced is as a loan and the receipt of one-half of the net profits is in lieu of payment of interest upon said indebtedness. As a matter of fact, if there were profits then there would be no indebtedness by reason of advances, as hereinbefore pointed out.

Further, it might be noted that under the very plain provision of the contract the Costaloupes were absolved from payment of any interest either on the mortgage note or in the previous advances or in advances made during the life contract. Therefore, if there was a specific waiver of interest as a part consideration of the agreement then the general provision, in a separate paragraph of the contract, that profits received should be in lieu of interest, becomes purposeless other than as a scheme in attempted evasion of partnership liability.

The judgment is affirmed.

Knight, Acting P. J., and Cashin, J., concurred.