[Civ. No. 138. Fourth Appellate District.—October 10, 1930.]

W. O. CHASE, Respondent, v. VAN CAMP SEA FOOD COMPANY, INC. (a Corporation), Appellant.

William H. Wylie and E. P. Sample for Appellant.

J. J. Brennan and W. J. Collard for Respondent.

HAINES, J., *pro tem.*—The complaint in this cause alleges that on or about June 10, 1927, appellant Van Camp Sea Food Company, Inc., entered into an agreement with respondent, W. O. Chase and one O. W. Chase, both of whom were originally plaintiffs, whereby they were to work for appellant in fishing and cleaning fish; that between June 10, 1927, and November 1, 1927, the said W. O. Chase and

O. W. Chase did work for appellant in fishing and cleaning fish for it; that, as consideration of such work to be performed by the Chases, appellant agreed to pay them $1.50 per ton for all fish which they should clean for it and "an additional 10% of all fish caught and delivered to defendant (appellant) company from July 15, 1927, to October 27, 1927, amounting to One Thousand Six Hundred Seventy Two Dollars and Seventy Cents ($1672.70)''. This latter allegation is, in itself, unintelligible, but other averments follow which, construed in the light of the evidence, seem to show its meaning to have been that appellant agreed to pay the Chases for such fish as they should catch and deliver to it, at the same rates at which packers in the region should from time to time be buying fish from other fishermen, and, in addition thereto, a bonus of ten per cent computed thereon, and that on that basis the aggregate price of the fish which the Chases caught and delivered to appellant in pursuance of the agreement, figured without the bonus, came to $1672.70, and, therefore, that, in addition to that sum, the Chases became, under the arrangement entitled to a bonus of $167.27. There is no allegation in the terms either of the quantity of fish delivered under the agreement or of the price per ton to be paid for all or any of it nor of the quantity of fish cleaned by the Chases or either of them. Performance of the agreement by the Chases is alleged, and part payment of the agreed compensation, but a balance, inclusive of the $167.25 bonus, aggregating $2,469.54 of money earned under the contract is claimed as still due, owing and unpaid from appellant to respondent W. O. Chase and the said O. W. Chase.

The answer admits an agreement entered into on or about June 10, 1927, between appellant and the two Chases whereby the Chases were to work for appellant in fishing and cleaning fish, states that the period of employment was to be from July 10, 1927, to November 1, 1927, and admits appellant's agreement to pay $1.50 per ton "for hauling any fish cleaned" by the Chases (it being claimed in appellant's closing brief that the use of the word "hauling" is a typographical error, the intention having been to admit the agreement to pay at said rate "for *all or* any fish" so cleaned). The answer, however, denies the bonus arrangement and denies any indebtedness to the Chases, by which it is ap-

parent that the intention is to deny that anything payable to them under the terms of the contract remains unpaid, and denies all other allegations of the complaint not specifically admitted.

On the trial it appeared from the testimony of respondent W. O. Chase who is the father of the said O. W. Chase, that a contract which was placed in evidence, consisting of a written offer by W. O. Chase, accepted in writing by appellant, was made on April 1, 1926, whereby the elder Chase agreed to fish for appellant exclusively for five years beginning June 1, 1926, and to "split", which in the parlance of the trade means to "clean", all appellant's "round tunas" during the life of the agreement, for which it was agreed that the said W. O. Chase should be paid on demand "the regular prices for fish as obtained between the fishermen and the canneries on the date of delivery", with ten per cent additional as a bonus, and also $1.50 per ton of fish "split" for doing the "splitting". The contract provided that either party might terminate it by a notice in writing given to the other between May 1st and June 1st of any year of its life, but at no other time. It also undertook to provide, in the event of its breach by either party, for $1,000 liquidated damages to the other.

Respecting this contract, respondent W. O. Chase testified as follows: "Q. . . . Is this the one you claim to have been working under all that time,—this agreement of April 1, 1926? A. Yes, sir. Q. There never was any new one made? A. No, sir."

He goes on to say that a new arrangement was twice discussed, but never made. On another occasion during the examination of this respondent the court remarked: "There is another complication. This suit is 'W. O. Chase and O. W. Chase.' This contract seems to be only 'W. O. Chase.'"

The witness responded: "W. O. Chase and O. W. Chase were partners. We were both the same thing."

Elsewhere, however, he said: "I hired O. W. Chase to help me split the fish and paid him one-half of what we received out of it, and still owe him for the balance of his half of what's coming."

O. W. Chase, the son, testified with respect to his arrangements with his father: "We agreed to work on a 50-50 basis

and split this money between us 50-50 for all the fish that we cleaned.''

And again: ''Q. Do you claim any part of this money that your father is suing for yourself? A. Half of it should be mine. It is supposed to be mine—50 per cent. That is the way we worked.''

At the close of the plaintiff's case in chief and while a motion for nonsuit was pending, plaintiffs' counsel, with leave of the court, dismissed as to the son, O. W. Chase, leaving as the only plaintiff the respondent W. O. Chase. No leave to amend the complaint so as to make the date alleged as that of the contract conform to the date of the writing nor to allege that appellant contracted with W. O. Chase alone, was asked, or granted and no amendment made. On the completion of the trial the court made findings to the effect that, on or about June 10, 1927, appellant employed respondent W. O. Chase (the father) for the period extending from June 10, 1927, to November 1, 1927, to clean, catch and deliver fish to it at appellant's place of business in San Diego and agreed to pay him $1.50 per ton for all fish cleaned by him there, and agreed, also, to pay him a bonus of ten per cent on the purchase price of all fish caught by him and delivered to appellant there between July 15, 1927, and October 27, 1927; that between June 10, 1927, and November 1, 1927, respondent under said contract cleaned there for appellant 3,227.9 tons of fish, and between July 15, 1927, and October 15, 1927, delivered there to appellant ''a quantity of fish the purchase price of which amounted to'' $1672.70. The court further found that there became due under the contract from appellant to respondent W. O. Chase for such cleaning of fish $4,840.85 (there being an error of $1 in the computation, since, on the basis adopted, it would figure $4,841.85), and for fish delivered, $1672.70, and for the bonus on the latter sum $167.27; making in the aggregate $6,681.82 (this being $1 more than the footing of the three items as given in the findings, which error corrects the other error in computation just referred to). It was further found that on said sum there had been paid altogether $4,411.05, leaving a balance due from appellant to respondent O. W. Chase of $2,270.77. Judgment against appellant and in favor of respondent W. O. Chase was entered for that sum accordingly and it is from that that the present appeal is taken.

Appellant contends that respondent W. O. Chase was not the real party in interest in respect of the entire claim set out in the complaint, nor in respect of the whole amount for which judgment was rendered, and, therefore, that such judgment, running in favor of him alone, was erroneous. There is no substantial evidence in the record that appellant made any contract with the Chases or either of them other than the written contract of April, 1926, to which, on its face, appellant and respondent W. O. Chase were the only parties. While, however, there is no *evidence* of any other contract, the answer undertakes to admit that some contract was made on or about June 10, 1927, whereby appellant employed both respondent W. O. Chase and said O. W. Chase to "work for defendant in the occupation of fishing and cleaning fish". ■ Undoubtedly it is true, as urged by appellant, that evidence may not be received to contradict an admission on the pleadings. (*Burke* v. *Table Mountain Water Co.,* 12 Cal. 403, 407; *Blankman* v. *Vallejo,* 15 Cal. 639; *Mulford* v. *Estudillo,* 32 Cal. 131, 138; *Hellman* v. *Howard,* 44 Cal. 100, 103; *Howard* v. *Throckmorton,* 48 Cal. 482, 490; *People* v. *Stockton & C. R. R. Co.,* 49 Cal. 414; *Malone* v. *Roy,* 118 Cal. 512, 514 [50 Pac. 52]; *Adams* v. *Wallace,* 119 Cal. 67 [51 Pac. 14]; *Murphy* v. *Coppieters,* 136 Cal. 317, 319 [68 Pac. 970]; *Gabriel* v. *Tonner,* 138 Cal. 63, 67 [70 Pac. 1021].) It is also true that findings in contravention of admissions on the pleadings must be disregarded. (*Hendy Mach. Works* v. *Pacific etc. Co.,* 99 Cal. 421, 424 [33 Pac. 1084]; *Gamache* v. *South School Dist.,* 133 Cal. 145, 147 [64 Pac. 301]; *Welch* v. *Alcott,* 185 Cal. 731 [198 Pac. 626].) ■ But, in this case, when the supposed admissions are analyzed, it appears that they are largely without content. Instead of admitting the allegations of the complaint that the Chases were to be paid "$1.50 per ton for any and all fish cleaned by them", the agreement admitted in the answer is to pay $1.50 per ton for "hauling any fish cleaned", which admits nothing that is alleged. Appellant may be right in saying that the use of the word "hauling" was a clerical error, but the pleadings supply us with no means of correcting it and, there being in the answer a denial of whatever is not in terms admitted, the allegation regarding the price to be paid for the cleaning stands denied. Again, if, as distinguished from what is said about the agreed price for fish cleaned, we construe the com-

plaint as undertaking to allege that a price was agreed on for fish *delivered* in substantially the terms suggested, such allegation, by virtue of the general denial of whatever is not admitted, stands denied, and we just saw that the allegations about the bonus are expressly denied. Moreover, as respects the period of the employment, we saw that the complaint alleges that the work was done between June 10th and November 1st, and that the bonus was applicable to fish caught and delivered from July 15th to October 27th, whereas the answer undertakes to admit what is not alleged, namely that the period during which it was agreed that the work generally should be done was from July 10th to November 1st. In fine, where the allegations are compared with the admissions, the discrepancies are so apparent that, taking them altogether, we cannot say that there is admitted on the pleadings a contract to which we can attach any meaning, or such a contract as should exclude proof that the actual agreement was that embodied in the writing of April 1, 1926. On the other hand, if we are permitted to look beyond the pleadings on the subject to the evidence, it cannot be doubted that that writing was the contract and the only contract under which the work here in question was done. ■ Again, if we are permitted to look beyond the pleadings to the evidence, there is no actual doubt regarding the respective relations of the two Chases to the enterprise in so far as their relation to it concerned the appellant. Though the elder Chase testified, as we saw, that he and his son were "partners", he also testified that he "employed" his son. It is, of course, apparent that he had the vaguest ideas about what the relations between himself and his son really amounted to. So far as appellant was concerned with the contract, however, it was that of the father, and that remains true whatever may have been the actual arrangements of father and son with each other. ■ Beyond doubt, therefore, it would have been competent for the elder Chase to have originally brought this action in his own name alone, for, under section 369 of the Code of Civil Procedure, a trustee of an express trust may sue without joining with him the persons for whose benefit the action is prosecuted and a person with whom or in whose name a contract is made for the benefit of another is, by the express terms of the statute, declared, within its meaning, to be the trustee of an express trust. As the rule is put in 47 C. J. 64: "A person con-

tracting in his own name with another may sue the other party to the contract without joining with him as coplaintiffs persons who may have an interest in the contract as against plaintiff.''

To this point are *Brown* v. *Salisbury,* 123 Fed. 203; *Beekman Lumber Co.* v. *Kittrell,* 80 Ark. 228 [96 S. W. 988]; *Hall* v. *Allen,* 46 Colo. 355 [104 Pac. 489]; *Halliday* v. *White,* 66 Hun, 635 [21 N. Y. Supp. 878]; *Murchison* v. *Western Union Tel. Co.,* (Tex. App.) 15 S. W. 416.

While, however, this action might, thus, have been brought by the father Chase, it was in fact brought by father and son, and, therefore, appellant was confronted with a claim made by both jointly against it. Evidently if notwithstanding the fact that on motion of plaintiffs' counsel the case was dismissed as to the son, the latter could commence a new action for the same cause, it would prejudice appellant's rights were judgment rendered in favor of the father in the son's absence. We think, however, that the trial court was right in regarding the dismissal by the son as a *retraxit* which would estop him as against appellant from suing anew.

''A *retraxit* occurred at common law when a plaintiff came into court in person and voluntarily renounced his suit or cause of action, and when this was done and a judgment was entered in favor of defendant the plaintiff's cause of action was forever gone.'' (*Westbay* v. *Gray,* 116 Cal. 660, 666 [48 Pac. 800].)

It is, in this state, held that the authority to make a *retraxit* is vested in an attorney of record. (*Westbay* v. *Gray, supra,* p. 666, citing *Board of Commrs.* v. *Younger,* 29 Cal. 147 [87 Am. Dec. 164]; *Merritt* v. *Campbell,* 47 Cal. 542.)

It has, indeed, been held (*Merritt* v. *Campbell, supra,* at p. 547) that ''a mere dismissal of an action by the plaintiff under the statute and without any agreement upon his part to do so'', will not ordinarily constitute a bar to its renewal, nor will a nonsuit, though entered by consent, and in *Pyle* v. *Piercy,* 122 Cal. 383, 385 [55 Pac. 141], the Supreme Court said that it was not inclined to extend the doctrine of *retraxit* as recognized in *Merritt* v. *Campbell.*

In the present case, however, though the dismissal was without any agreement with appellant, it was in the circumstances done with the manifest purpose on the part of the son, acting through the counsel who represented both him-

self and his father, to enable his father to prosecute the action to judgment without being embarrassed by his presence as a party. In these circumstances every consideration of justice to appellant demands that the son's conduct be treated as a *retraxit* and we do not hesitate to say that it must be given that effect.

Upon the dismissal of the action so far as O. W. Chase, the son, was concerned, then, there remained no other obstacle to its proceeding to judgment on the basis of the contract of April 1, 1926, than the circumstance that no leave to amend the complaint was actually sought or given so as to allege the employment of W. O. Chase alone instead of the employment of both O. W. Chase and W. O. Chase. Undoubtedly, so far as the formal pleading was concerned, the allegation of an arrangement made with the two original plaintiffs remained unaltered, and there is some ground for the contention that the proof of an obligation to one of them only was a variance. (*Weinreich* v. *Johnston,* 78 Cal. 254 [20 Pac. 556].) Yet it seems clear that the dismissal as to O. W. Chase was treated both by counsel for respondent and by the trial court as substantially amounting to an amendment of respondent's pleadings so as to allege that appellant's arrangements were made with W. O. Chase only, and that the trial proceeded on that basis, though over the protest of appellant. Appellant's objection, however, was not directed to any amendment, for none was offered, but was to the fact of dismissal itself. In effect, this was a claim that the court had no right to permit a change in the complaint as it then stood. As a matter of fact, the trial proceeded as though the complaint had been amended. The dismissal as to the one plaintiff went further than removing his name from the title of the case, and the case proceeded upon the basis that this plaintiff had been eliminated from the cause of action. This having operated as a *retraxit* as far as that plaintiff's rights are concerned, the answer having denied all that remained of the complaint, and the trial having proceeded upon that theory, no substantial right of the appellant was affected by treating the complaint as so amended, which, in effect, is what the trial court did. No miscarriage of justice appearing, we think the case should not be reversed for this wholly technical error, the practical effect of which was *nil.* (Const., art. VI, sec. 4½.)

The evidence is far from direct about the quantities of fish cleaned. It appeared without conflict that for fish cleaned between June 10, 1927, and August 26, 1927, respondent W. O. Chase was, in two checks, paid an aggregate of $529.35. There is in the record nothing else to show the weight of fish cleaned by him during that time; but, at the rate of $1.50 per ton, that would account for 352.9 tons. The main effort was directed to showing the quantity cleaned between August 26, 1927, and October 27, 1927, which respondent claims to have been 2,875 tons. This figure, added to the said 352.9 tons, makes the aggregate of 3,227.9 tons mentioned in the findings as the aggregate quantity of fish cleaned. Appellant, however, vigorously attacks the proposition that respondent W. O. Chase has established 2,875 tons or any definite quantity of fish as actually cleaned by him between August 26th and November 1st, and it is, therefore, necessary to notice the evidence relied on to establish the quantity. Respondent claims that in person, or through his son and another helper employed by him, he cleaned all the fish that were cleaned at appellant's establishment during the period in question, whether bought from him or other fishermen. The method employed to fix the quantities of fish cleaned was to endeavor to determine the aggregate quantity of fish delivered, during the time, from the various boats engaged in the fishing, by whomsoever owned. Appellant's practice was to have each boatload of fish weighed as received and to issue what is known as a "fish ticket" for the quantity delivered. The person ordinarily charged with doing the weighing and issuing the "fish tickets" was one Walter Oliver, an employee of appellant, apparently serving as a subforeman, general utility man, and more or less as a bookkeeper as well as a fisherman. He was not always there, however, and when he was not, other employees would weigh fish received and issue tickets. The evidence tends to show that such tickets, or copies of them, were preserved on appellant's files, though to some extent they seem to have temporarily remained in Oliver's possession. During the times with which we are concerned, up to October 25, 1927, one John Sieverling was manager of appellant's San Diego establishment. On that day he was superseded as manager by one Johnson and one Quamma, who were, thenceforth, joint managers for appellant at San Diego. On the same

day W. O. Chase was discharged, but was allowed to go on and clean fish for two days more. Just then Oliver was in Mexican waters fishing for appellant, and, on returning, he also left appellant's employ. The evidence tends to show that despite his discharge as manager, Sieverling remained at appellant's establishment at least part of the time for some days thereafter, apparently engaged in cleaning up the accounting for the period of his management. According to respondent he had, for some time prior to Sieverling's discharge been trying to get from the latter a settlement of respondent's account to date. From October 25, 1927, on, according to respondent, he made daily demands on Johnson for appellant's figures as to the fish he had cleaned for it, and demanded his money. The following is excerpted from his testimony on the subject: "I told him, I says: 'You have got the books' and so on. 'Well now,' he says, 'wait a minute,' he says: 'We are not concerned; we do not know anything about this business; we have just come in; we are all strangers,' and so on. 'Well,' I says, 'you have got the books. Why can't you pay me?' 'Well, Walter (Oliver) is going to be back in a few days; and John (Sieverling) is straightening these things up as fast as he can.' "

Elsewhere respondent testified: "Mr. Sieverling was going to stay there two weeks after he was discharged and settle up all this business."

Questioned about this phase of the matter he further testified: "Q. You have told us here that there was some arrangement by which Mr. Sieverling was to stay there and look after things for two weeks after he was discharged? A. Yes, it would take him about two weeks to straighten everything up. Q. Did he do that? Did he go on looking after things for two weeks? A. Yes."

Elsewhere he testified: "I went down to Mr. Johnson and Mr. Quamma and demanded my money; and they told me that Mr. Sieverling would settle. So I went to Mr. Sieverling. He said that he would have to wait until Walter got back—Walter Oliver got back; he was down in Turtle bay, in the employ of the Van Camp Company. And he did come back; and then they had him go to work on the books and make out the statement so we could settle how many fish was brought in."

Both app~llant's present managers, Johnson and Quamma, testify that Sieverling had no authority to transact any business for appellant after October 25, 1927, and that Oliver had none after he returned from Mexican waters, bnt the effect of this is considerably weakened by other testimony given by Johnson. Being asked whether he ever authorized Oliver or anyone else to submit statements of fish received by appellant, he, after some hesitation, said: "I may have— I will say that I have asked them, believing everything had been carried on previous to my taking that job as it should have been. I do not know whether there is any objection to that or not if my statement is qualified in that manner. I may be wrong too. . . . I may have asked him to, believing. . . . Q. Asked who? A. Either Sieverling or Oliver, to have—I question very much, however, that it was Oliver. I may have asked Sieverling because I have known this man for years. Q. Asked Sieverling what? A. To help formulate the figures. As soon as I took this job, Mr. Chase came and wanted a settlement, wanted the money for the cleaning of these fish. . . . "

Respecting his request to Sieverling he says farther: "I didn't make the statement that I did ask him. I may have asked him."

Oliver returned at some time, which the evidence does not precisely fix, after November 1st. After his return a boy delivered to respondent W. O. Chase an envelope addressed to respondent, in Sieverling's hand, containing three sheets of printed form used by appellant to summarize the data compiled from "fish tickets" on which were filled out in Oliver's hand what purported to be a statement compiled from the fish tickets of the weights of fish delivered to appellant by the boats of the several fishermen between August 26, 1927, and November 7th of that year, the date, name of boat and number of pounds delivered being specified in the case of each delivery. These three sheets were admitted in evidence over appellant's objections and are, together, known as exhibit 2. Respondent W. O. Chase kept a rough record of fish cleaned, with which he compared the quantities given on this exhibit 2, and by which he testifies that he was able to verify them as correct. He says that, by experience he has found that there is about one can of offal for every two tons of fish cleaned, and that he was in this way able to tell

pretty closely how many tons he had cleaned and that this was the basis of his own record. Having received this quantity statement and checked it with his own record, after having Oliver at his residence checking it over with him, respondent says that he agreed with Sieverling on what was due him. "Yes; we settled on the amount of tonnage and the amount of money that was due me." Elsewhere he says that the tonnage for which it was so agreed that he was entitled to pay for cleaning after August 26, 1927, was the 2,875 tons already referred to. Referring to Sieverling, he testfied that "as soon as he got this (i. e., the statement compiled by Oliver)—he sent me up this statement and asked me to compare it with my book. And I . . . compared it and found it was correct." He says that on one occasion he went to the cannery, that Johnson and Quamma were there, but without speaking to him went into another room with Sieverling and Oliver and engaged in a prolonged conference; that finally Oliver came out and said they had not reached respondent yet, but to come back that afternoon. He says that he did come back on the Saturday following, taking the statement (Ex. 2) to Sieverling. He described the situation there as follows: "They was busy down there, And I says: 'Well John, let's get busy now; I want my money.' 'All right Billy,' he says, 'We are awful busy.' Sieverling was there at the desk with Mr. Quamma and Mr. Johnson, the new manager; and he says: 'It will be a special favor to me if you will wait until Monday. You can come down Monday and we will make you out a check for these various items and there is no question about the amount.'"

All this, respondent says, occurred in the presence of Johnson and Quamma, and he says, further, that he showed the statement to Johnson, who did not, however, read it. He places this occurrence on the next Saturday after November 4th. According to the calendar this would make it November 5th. That cannot be the right Saturday, because, as we saw, the last item in Oliver's statement was dated November 7th. The trial court may have believed that respondent mistook the date and that this conference really occurred a week later. At all events, respondent says that he called at the cannery the Monday after this, but that Sieverling failed to appear and that he never saw him afterward. Sieverling, in fact, seems shortly afterward to have undergone an operation and has since died.

The settlement was never made. Respondent did get a $300 check dated, and cashed by him, on November 4th. This, he says, was handed to him as a payment, pending a settlement of his full account, though there is some confusion in his statements about the particular connection in which this occurred. There is much vagueness and some contradiction in respondents' testimony both about what was done and the dates of the occurrences, but perhaps not more than must be expected from a somewhat unlettered man trying to recall what occurred long before he was testifying.

In view of the evidence that we have in part recited, we cannot say that the court erred in admitting the quantity statement (Ex. 2) on the theory that Oliver and Sieverling were authorized by appellant to compile it and to furnish it to respondent.

It is still objected that this statement, even if properly received, proves nothing. There are several boatloads of fish shown on it, for cleaning which respondent concedes that he has no right to charge. He has, as he claims in collaboration with Sieverling, calculated these out of his own figures on the face of the several pages of the statement itself. It seems that numerous boatloads of fish were, for convenience, delivered at appellant's cannery, but immediately turned over to another concern. These are distinctly indicated on the statement by the initials "C. P. C." and have been calculated out except in one instance where the testimony indicates that 72 tons of one boatload is so designated by error, and really belonged to the Van Camp Company. Such 72 tons are therefore retained. An inspection of these pages, making up exhibit 2, discloses certain errors in calculation apparent on its face. The addition of quantities in the last column of its first page, footed as 1,356,760 pounds is wrong, the correct footing of the column being 1,467,480 pounds. The addition of the quantities in the first column of its second page footed as 1,749,937 pounds, is wrong, and should actually foot 1,749,918 pounds. The addition of the quantities in the first column of the third page, to wit, 2,343,441 pounds, is. right. The aggregate of the figures in those three columns, plus 300,000 pounds for fish caught in local waters, was relied on by respondent as totaling 5,750,138 pounds or, when reduced to tons, the 2,875 tons charged for as cleaned between August 26th and

October 27th. With the corrections noted, this aggregate should be 5,860,839 pounds. Apparently, however, there were included in the total for which respondent charged, an aggregate of 79,318 pounds delivered in the first week of November after respondent had quit work, which he attempted to deduct without carrying out the deduction, and 62,984 pounds delivered by the boat "Uncle Sam" on October 29th, which was also after he had quit work and which he omitted to deduct. The aggregate of the last two items is 142,302 pounds. If that is deducted from the said 5,860,839 pounds there is left 5,718,537 pounds, or 2,859.2 tons, which is less than the tonnage charged for by 15.8 tons, which, at the rate of $1.50 per ton would call for a reduction of the judgment by $23.70.

 The point is made that some of the fish which respondent is by the judgment given the credit for "splitting", were not split at all, but cooked whole, a practice referred to in the evidence as unlawful. According to the respondent the Chases were there ready, as contemplated by the contract, to split all the fish, gained nothing from the circumstance that some were not split, and were told that no deduction would be made from the compensation because of the fact that for reasons of its own, appellant saw fit to cook some of the fish without having them cleaned. In these circumstances we cannot say that the court erred in failing to make a deduction on that account. Appellant claims that the trial court found that respondent was not entitled to credit for cleaning the fish that appellant cooked whole. We do not so construe its finding.

 We have next to deal with the fish of respondent's own catch, delivered to appellant during the time in question; for, though respondent cleaned fish for appellant regardless of who delivered them, he delivered only those caught by his own boat. Appellant claims that the record is "absolutely bare of any finding, allegation, claim or evidence of the quantity of fish that W. O. Chase and O. W. Chase delivered to appellant". That the complaint is lamentably vague on the subject we have seen, and it is true that the findings state neither the quantities of fish delivered nor the prices that prevailed when the several deliveries were made. What they do state is that respondent W. O. Chase, between July 15, 1927, and October 27, 1927, delivered fish for which

the purchase price was $1672.70, from which it would follow that the bonus, computed at ten per cent of that figure, would amount to $167.27 as found. We cannot agree that the record shows these figures to have been reached without evidence. Respondent W. O. Chase produced a memorandum book which, according to his testimony, he kept in his own hand, regarding these matters. ▮▮▮ It is claimed that this book was not in evidence, but the record shows that it was. It was distinctly offered and counsel for both parties had questioned the witness about the way that it was kept, and the court having expressed its opinion that sufficient foundation for its use had been laid, the following colloquy occurred: "Mr. Wylie, (Appellant's counsel) 'All right Your Honor; if you feel that way I will withdraw my objection. That is I have the general objection in there.' The Court: 'Objection overruled.' "

No copy of this book, or of any of the entries in it appears in the reporter's transcript, but, as it indubitably appears that it was before the trial court, and appellant has not brought it up as part of the record for our inspection, we must presume that it supports the court's finding.

Respecting the operations of his boat respondent W. O. Chase testified: "Q. . . . We will take up the $167. What is that? A. During the season I caught $1672 worth of fish. You see we had a tremendously poor season." . . . "This is for fish I caught in my own boat." "We got 10% of that as a bonus in addition."

Of the $1672.70, sometimes referred to by him as "$1,672", the witness testified that there remained unpaid to him $91.56, and, in course of the trial, appellant's counsel repeatedly conceded that, on account of fish delivered, there remained due and unpaid that much of a balance. The method followed in the findings was not to determine the balance due for each of the respective items claimed, i. e., the original price of the fish delivered, the bonus thereon, and the compensation for fish cleaned, but, rather, to add together the total amounts earned on each of the three accounts, and to add separately the payments made, without distinguishing the items to which these were attributable, and then to subtract the second total from the first, to arrive at the aggregate balance remaining unpaid. As respects the fish caught by respondent W. O. Chase and delivered, we are unable,

from the record, to say that the court's finding as to its aggregate price, at what we must assume that it determined to be the agreed valuations as deliveries were made, was not supported by the evidence. If the finding on that subject is right, then, as we just saw, it follows that the finding about the amount of the bonus is right also.

There are other rulings on the admission of evidence assigned by appellants as errors. Suffice it to state that, after examining them all we are unable to say that any such errors in admitting evidence have been made as to result in any miscarriage of justice. ██ Appellant introduced no evidence at the trial to establish what were the actual quantities of fish delivered to it by respondent, or to establish what in fact were the quantities of fish cleaned for it by respondent. It chose to stand on its legal rights and devote its efforts to attacking the showing made by respondent. Doubtless it had the right to take this course, and, doubtless, notwithstanding that it took this course respondent was legally obligated to make a *prima facie* case before he could be entitled to any judgment. But we do not, in the circumstances, feel called upon to hold that the case made was insufficient to sustain in substance the action of the trial court.

The judgment is reduced by $23.70, that is to the sum of $2,247.07 and costs, and, as so reduced, is affirmed. Respondent is to recover his costs on appeal.

Marks, Acting P. J., and Barnard, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on November 5, 1930, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on December 9, 1930.